**Martha FOSTER, Plaintiff-Appellant,**

v.

**DAON CORPORATION,**
**Defendant-Appellee.**

No. 82–1329.

United States Court of Appeals,
Fifth Circuit.

Sept. 2, 1983.

Thomas K. Boone, Sam S. Stollenwerck, Paul B. Van Ness, Dallas, Tex., for plaintiff-appellant.

Steve Brutsché, Dallas, Tex., for defendant-appellee.

Before RUBIN and JOLLY, Circuit Judges, and PUTNAM,[*] District Judge.

PUTNAM, District Judge:

## I

Martha Foster (Foster) filed this suit for a reduction of the price she paid for a condominium in the Gold Crest Condominium complex in Dallas, Texas, purchased on October 31, 1979 from defendant, Daon Corporation, a Delaware Corporation (Daon). The principal place of business of Daon is in California. The sale was made in accordance with an agreement to purchase entered into on October 11, 1979, at an agreed price of $140.03 per square foot. Foster's representative, Richard C. Bayci (Bayci), and Foster knew that $140.03 a square foot was excessive, and attempted to negotiate a lower price without success. Daon's own appraiser agreed that this price was exhorbitant.

On August 17, 1979, Daon-Texas, a Texas general partnership was formed in which Daon owned a 95% interest and Daon Financial Services, Inc., a Texas corporation doing business as Texco, Inc., owned 5%. Both of these corporations were wholly owned subsidiaries of Daon Netherlands B.V., a Netherlands corporation. Under Texas law, the partnership was a separate legal entity from its individual members. By act dated October 25, 1979, effective August 17, 1979, Daon conveyed all of its interest in the Gold Crest complex to Daon-Texas. This conveyance was placed of record on October 29, 1979, and was made subject to all "currently existing Contracts of Sale relating to individual condominium units." Foster was not informed of the existence of the partnership, when she entered into the Contract of Sale on October 11, 1979.

Foster was interested in maintaining the retail value of her condominum (No. 204) at $140.00 per square foot, and in protecting herself against a drop in prices to other retail purchasers of individual units in Gold Crest, a converted apartment complex. At the time of the sale to her, Daon was offering these units to building occupants at $140.00 per square foot and giving them the right of first refusal for the units occupied by them. They were offered to "outsiders" at a price of $160.00 a square foot. Foster insisted upon a "minimum price" provision in an addendum to her Contract of Sale to insure that she did not suffer as a result of future retail price reductions. This clause reads as follows, viz:

> "Seller hereby covenants and agrees that, until such time as it has conveyed title to all of the Condominium Units within the Gold Crest Condominiums, no Condominium Unit shall be sold for a purchase price less than One Hundred and Forty and No/100 Dollars ($140.00) per square foot, unless the Purchaser is compensated as provided herein. If a Condominium Unit is sold for less than One Hundred and Forty and No/100 Dollars ($140.00) (hereinafter referred to as the "Minimum Price"), per square foot, Seller hereby agrees to pay to Purchaser a sum equal to the product of the amount by which said lower price per square foot is less than

* District Judge, of the Western District of Louisiana, sitting by designation.

the Minimum Price per square foot multiplied by the number of square feet in the Condominium Unit (Unit 204) hereby conveyed. If a Condominium Unit is sold for less than the Minimum Price per square foot and Purchaser is compensated by Seller as provided herein, Seller hereby agrees that for each Condominum Unit sold thereafter for less than the Minimum Price per square foot multiplied by the number of square feet in the Condominium Unit (Unit 204) hereby conveyed; provided, however, Seller shall be obligated to pay to Purchaser only the amount, if any, by which said sum exceeds the amounts previously paid to Purchaser by Seller hereunder. Purchaser and Seller acknowledge that 904/905, 1005, 1104, 1105 and 1106 have been sold at prices less than $140.00 per square foot and will be excluded from the provisions of this paragraph."

Technically, Daon did not own the property it sold to plaintiff on October 31, 1979. It had sold all of its interest in Gold Crest to Daon-Texas on October 25, 1979, made effective as of August 16, 1979. This defect was cured on January 22, 1980, by execution of a special warranty deed by Daon-Texas correcting the sale to Foster to show the partnership as her vendor instead of Daon, as the deed was originally drawn. This corrective instrument was recorded on January 22, 1980. Foster was not a party to this deed, and it did not in any sense diminish Daon's obligations to her.

The bulk transfer of Gold Crest to Daon-Texas had a value of $95.23 per square foot according to the records of Daon and Daon-Texas. One other bulk transfer of twelve units was made on April 10, 1981 to Michael Ginsberg, Trustee, for a price of $85.00 per square foot, by Daon-Texas. Individual sales made by Daon-Texas on the retail market ranged from highs of $140.00 per square foot in October and November of 1979, to a low of $102.90 per square foot on October 9, 1980, this being a sale to Daon.

██ The interpretation of paragraph 5 of the Addendum to Foster's sale, quoted above, is crucial to our decision. The trial court treated the transfer of October 25, 1979 from Daon to Daon-Texas as a conveyance of all of the Gold Crest units to the partnership. In this view, when the transfer to Daon-Texas was completed, Daon had "conveyed title" to all of the condominiums and Foster's minimum price provision was thereafter inoperative. However, the trial court also found that the minimum price provision was intended by the parties to cover only retail sales of individual units to the purchasing public and not to bulk sales of more than one unit. Accepting this finding as correct, which we do, it is difficult to understand how the bulk transfer of all Gold Crest properties to Daon-Texas would have any effect whatsoever upon the agreement. At the time this clause was written, Daon was engaged in a program of selling converted apartments to individual purchasers at retail prices. Foster did not contemplate that title to these units would be conveyed except to individuals by sales at retail. Under these circumstances, we cannot agree that Daon was free to make conveyance other than sales, particularly to entities owned and controlled by it, and thereby defeat Foster's minimum price clause.[1] To so interpret this provision, in light of the obvious purpose for which it was drafted and incorporated into Foster's agreement to purchase, would be to convict petitioner of defeating her own objective. It is apparent that as used in the minimum price clause, the word "conveyed" is not used in its broad sense, but is instead restricted to individual retail sales on the open market reflecting the good faith market value of the units to individual purchasers.

In contract interpretation, "the primary concern" of Texas courts "is to ascertain the true intentions of the parties as ex-

---

1. This transfer was brought about by Daon to restructure its organization for tax and business purposes, and was not a sham transaction done for the purpose of defeating plaintiff's rights.

pressed in the [contract] instrument."[2] Texas law instructs us to consider "the wording of the contract *in the light of the surrounding circumstances,* in order to ascertain the meaning that would be attached to the wording 'by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended to mean.'"[3]

If the contract is "so worded that it can be given a definite legal meaning or interpretation, then it is not ambiguous and the court will construe [it] as a matter of law."[4] If, on the other hand, "after applying the established rules of interpretation, a written instrument remains reasonably susceptible to more than one meaning, extraneous evidence is admissible to determine its true meaning."[5] Determining the parties' intent through extrinsic evidence is a question of fact to be determined by the fact-finder.[6]

Construed in the light of these rules and the surrounding circumstances, the minimum-price clause was evidently intended to protect Foster against sales of condominium units to individuals at a price lower than she had paid until such time as each condominum unit had been sold to an individual.[7]

The Texas Uniform Partnership Act unequivocally states that partners are jointly and severally liable for acts and obligations of the partnership and the partnership is liable for the act of the partners. Tex. Rev.Civ.Stat.Ann., Art. 6132b §§ 13–15 (1970). This being so, plaintiff has a direct right of action against Daon for enforcement of this obligation, without the necessity of first proceeding against the partnership or joining it in her suit.

## II

Foster's complaint originally included a claim under the Texas Deceptive Trade Practices Act (DTPA), Tex.Bus. & Comm. Code Ann. § 17.41 et seq. The claim was barred, however, by the fact that Foster had failed to make a demand on Daon for the claimed damages before filing the suit. DTPA § 17.50A. When Daon asserted this defense in its answer, Foster moved to amend the complaint by dismissing the DTPA claim without prejudice. This would have allowed her to give the required demand wait 30 days as required by statute, and then reassert the claim.

The purpose of the 30-day demand requirement of the DTPA is to encourage voluntary settlement. *See Barnado v. Mecom,* 650 S.W.2d 123, 127 (Tex.Ct.App.1983); Goodfriend & Lynn, *Of White Knights and Black Knights: An Analysis of the 1979 Amendments to the Texas Deceptive Trade Practices Act, 33 Southwestern L.J. 941, 988–996 (1979).* The District court noted this purpose, and denied Foster's motion to amend, stating: "Normally, leave to file amended pleadings is to be freely given . . . However, notice is a prerequisite to bringing an action under § 17.50(b)(1) [i.e., the DTPA], and the Court has concluded that

**2.** *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983); *accord R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex. 1980); *Watkins v. Petro-Search, Inc.,* 689 F.2d 537, 538 (5th Cir.1982) (applying Texas law).

**3.** *Watkins,* 689 F.2d at 538 (emphasis added) (quoting *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981); *accord Coker,* 650 S.W.2d at 393; *Richland Plantation Co. v. Justiss-Mears Oil Co.* 671 F.2d 154, 156 (5th Cir.1982) (applying Texas law.)

**4.** *Coker,* 650 S.W.2d at 393; *accord Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 517, 243 S.W.2d 154, 157 (1951); *Watkins,* 689 F.2d at 538; *Richland Plantation,* 671 F.2d at 156.

**5.** *R & P Enterprises,* 596 S.W.2d at 519.

**6.** *Watkins,* 689 F.2d at 538; *Richland Plantation,* 671 F.2d at 156.

**7.** From the list of sales stipulated to in the pretrial order, the lowest price paid per square foot for a Gold Crest Condominium other than a sale to Daon, was $106.00, paid on February 5, 1981 by Mr. and Mrs. David J. Jackson. The Foster condominium (Unit 204) contains 2004.55 square feet according to the stipulation of the parties. The difference in the price paid by her, $140.03 per square foot, and the lowest price paid is $34.03.

no notice was given in this case. Since the DTPA claims were brought improperly thereby frustrating the underlying purpose of § 17.50A, the Court is of the opinion that the motion to amend should be denied."

Foster's second motion to amend also concerned a claim under the DTPA. On October 6, 1981, Foster sent Daon a notice of demand based on a separate violation of the DTPA. Less than 30 days thereafter, Foster moved to amend the complaint to add this second claim under the DTPA. Although the 30 days required by § 17.50A had not yet passed, Foster was concerned that the two-year statute of limitations would run before the 30-day waiting period expired. Section 17.50A(b) of the DTPA expressly provides:

> If the giving of 30 days' written notice is rendered impracticable by reason of the necessity of filing suit in order to prevent the expiration of the statute of limitations ... the notice provided for in Subsection (a) of this section is not required. . . .

The district court nevertheless denied leave to amend based on Foster's failure to give thirty days notice. The court noted the exception provided by § 17.50(b), but concluded: "While it is true that § 17.50A allows less than 30 days notice where it is necessary to file suit to prevent the statute of limitations from running, the Court is of the opinion that this exception should not apply where the plaintiff is aware of all of the facts on which his claim is based more than 30 days before the statute runs." This rule finds no support in the statute or in the Texas case law.

■■■■ We conclude that the district court acted incorrectly in denying the motions to amend. "Once a responsive pleading has been filed, a pleading may be amended only by leave of court or by consent of the adverse party. Fed.R.Civ.P. 15(a)." *Ross v. Houston Independent School Dist.,* 699 F.2d 218, 228 (5th Cir. 1983). "Rule 15(a) evinces a bias in favor of granting leave to amend. Its purpose is to assist the disposition of the case on its merits, and to prevent pleadings from be-

coming ends in themselves." *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.,* 690 F.2d 1157, 1163 (5th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).

In exercising its discretion, the trial court should consider whether permitting the amendment would cause undue delay in the proceedings or undue prejudice to the nonmoving party, whether the movant is acting in bad faith or with a dilatory motive, or whether the movant has previously failed to cure deficiencies in his pleadings by prior amendments. The court may weigh in the movant's favor any prejudice that might arise from the denial of leave to amend. In keeping with the purposes of the rule, the court should consider judicial economy and whether the amendments would lead to expeditious disposition of the merits of the litigation. Finally, the court should consider whether the amendment adds substance to the original allegations, and whether it is germane to the original cause of action.

*Id.* at 1163; *Carson v. Polley,* 689 F.2d 562, 584 (5th Cir.1982); *Lewis v. Knutson,* 699 F.2d 230, 239 (5th Cir.1983).

In this case there was no indication that amendment would cause delay or prejudice to Daon Corporation; the case was still in the pretrial stage. Nor is there any indication that Foster's motions to amend were brought in bad faith or for the purpose of delay. Foster had not previously failed to cure deficiencies in her pleadings through amendment. And, perhaps most significantly, she suffered great prejudice through the district court's denial of leave to amend; the statute of limitations ran on her DTPA claims.

Moreover, the district court's justifications for denying leave seem patently incorrect. With respect to the first motion to amend, he simply said that because notice had not been given the first time, Foster could not dismiss without prejudice in order to properly give notice before reasserting the claim. That Foster erred in failing to give notice the first time is not a sufficient

justification for denying her the opportunity to correct her error.

With respect to the second motion to amend, Foster sought to invoke the plain language of the DTPA permitting filing without notice to avoid the statute of limitations. The district court engrafted a new requirement, not mentioned in the statute or Texas caselaw, that the plaintiff not have known of the relevant facts for 30 days prior to filing suit. If Texas had wished such a requirement, it would have been easy enough to include it in the statute; they did not.

For these reasons, we hold that the district court abused its discretion in denying both motions to amend.

The judgment of the trial court is, accordingly, REVERSED, and this case is REMANDED for further proceedings not inconsistent herewith.