MCKNIGHT ET AL., APPELLEES, *v.* BOARD OF DIRECTORS, ANCHOR POINTE BOAT-A-MINIUM ASSOCIATION, INC. ET AL., APPELLANTS.

[Cite as McKnight *v.* Anchor Pointe Boat-A-Minium Assn., Inc. (1987), 32 Ohio St. 3d 6.]

(No. 86-694—Decided August 5, 1987.)

*Doyle, Lewis & Warner, Michael E. Hyrne* and *John A. Borell,* for appellees.

*Duffey & Henning* and *Fred E. Henning,* for appellants.

MOYER, C.J. The principal issue in this case is whether the trial court erred in enjoining the board from entering into agreements pursuant to the authority of the Third Amendment. The first question presented by this case is whether the board of directors of Anchor Pointe, elected on March 8, 1984, was legally constituted. This necessitates a determination of the status of First Federal. If, as appellants contend, First Federal was a good faith purchaser for value, then it was entitled to vote for all members of the condominium association's board of directors in proportion to its unit ownership. However, if First Federal assumed the role of developer of Anchor Pointe, under R.C. 5311.01(T), the board was not legally constituted, as the developer was entitled to appoint only five of the members of the board pursuant to Section 4, Article VII of the Declaration of Condominium Ownership.[1]

---

[1] Section 4, Article VII provides:

*"Section 4. Board of Directors.* The Board initially shall be those nine persons named as the initial Trustees pursuant to the provisions of the Articles, or such other person or persons as may from time to time be substituted by declarant. No later than the time that units to which 25% of the percentage interests in the Common Areas appertain have been sold and conveyed by the Declarant, the Unit owners shall meet, and at that meeting, the Unit owners other

R.C. 5311.01(T) defines "developer" as follows:

"* * * [A]ny person who, directly or indirectly, sells or offers for sale condominium ownership interests in a condominium development. 'Developer' includes the declarant of a condominium development and any successor to the declarant who stands in the same relation to the condominium development as the declarant."

R.C. 5311.01(N) provides:

" 'Sale of a condominium ownership interest' means the execution by both parties of an agreement for the conveyance or transfer for consideration of a condominium ownership interest, except 'sale of a condominium ownership interest' for purposes of this chapter shall not include a transfer of two or more units from the developer to another developer, a subsidiary of the developer, *or a financial institution for the purpose of facilitating the sale of or the development of the remaining or unsold portion of the property.*" (Emphasis added.)

Appellants maintain that the definition of "sale" provided in R.C. 5311.01(N) applies only when a determination must be made as to whether the consumer protection sections of the chapter contained in R.C. 5311.25 to 5311.27 apply. We disagree and reject the argument that we should employ the traditional notions of "sale" and "purchaser for value" and ignore the specific exception in R.C. 5311.01(N).

Generally, a secured party who takes collateral and sells or retains it in order to satisfy debt for which the collateral is given is a purchaser for value. However, the General Assembly has carved out an exception to that rule as it applies to financial institutions involved in condominium developments. This is apparent from the lack of limiting language in R.C. 5311.01(N). Although the General Assembly could easily have limited the application of R.C. 5311.01(N) to the warranty provisions provided in the chapter, it did not.[2]

Appellants contend that a mortgagee acquiring title to property through

than the Declarant shall elect four of the Directors and the Declarant shall designate the other five of the Directors, which nine Directors shall serve until the meeting described in the next paragraph. For purposes of computing the percentages of interests referred to in this paragraph, those percentages shall be computed by comparing the number of Units sold and conveyed to the original number of Units to be created (574).

"Within thirty days after the earlier of (A) five years from the date of the establishment of the Association, or (B) the sale and conveyance, to purchasers in good faith and for value, of Units to which 75% of the undivided interests in the Common Areas appertain, the Association shall meet and all Unit owners, including the Declarant, shall elect nine Directors to replace all of those Directors earlier elected or designated by the Unit owners or Declarant, respectively, and elect new officers of the Association. The terms of the nine Directors shall be staggered so that the terms of one-third of the Directors will expire and successors be elected at each annual meeting of the Association. Thereafter, at such annual meetings, successors to the three Directors whose terms then expire shall be elected to serve three year terms."

[2] Furthermore, R.C. 5311.24 does provide for exceptions to the applicability of R.C. 5311.25 to 5311.27 and a transfer to "a financial institution for the purpose of facilitating the sale of or the development of the remaining or unsold portion of the property" is not one of those exceptions. It is noteworthy that this is in contrast to Section 4-101(4) of the Uniform Condominium Act which does specifically exempt any disposition by foreclosure or deed in lieu of foreclosure.

foreclosure or by accepting a deed in lieu of foreclosure does not necessarily assume the role of developer. As mortgagee holding the real estate as security for the loan, the bank has a right to foreclose and take title to the security upon the mortgagor's default. The mortgagee then has the right to sell the property to satisfy the debt.

We agree with First Federal's contention that by acquiring title to property either through foreclosure or by accepting a deed in lieu of foreclosure, a mortgagee does not necessarily assume the role of the "developer" as defined by R.C. 5311.01(T). Generally, banks and other financial institutions that lend money to finance condominium developments are in the business of lending money and not building or developing condominiums. When such a lender is forced into its position as owner after a legitimate loan goes into default, the lender must be given the right to salvage its interest by selling the property. Such a situation, in and of itself, does not compel the lender to assume the obligations of a developer imposed by R.C. Chapter 5311 or the articles and bylaws of the condominium association.

It follows that a mortgagee acquiring title to property or other collateral has the right to protect its interest by taking reasonable steps to maintain or preserve the property. However, when the mortgagee performs such acts as to become so intertwined with the promotion and development of the property that it, in essence, has engaged in the business of the developer, it cannot insulate itself from the duties, constraints and obligations of a developer pursuant to R.C. Chapter 5311.

There is no "bright line" test which delineates with precision whether a mortgagee has taken such steps as to assume the role of developer. There are, however, certain factors that can be examined to determine if the lender has engaged in the business of developing or is acting solely to preserve its interest in the property. In *Chotka* v. *Fidelco Growth Investors* (Fla. 1980), 383 So. 2d 1169, a construction money lender acquired title from the original builder-developer through foreclosure proceedings following substantial completion of condominium development. The court found that Fidelco became more than just a lender when it took title to the condominium project, completed construction, and, holding itself out as developer and owner of the project, advertised and sold units to purchasers.[3]

The court in *Chotka* designated some of the factors a court may consider in order to determine the status of a lender acquiring title through foreclosure. For example, a court may consider whether the lender advertised the project or directly solicited potential purchasers, whether the lender participated in construction of units or common-area buildings, and whether the lender held itself out as the developer. *Id.* at 1170. Also relevant is whether the lender entered into contracts for services in which it shares a

---

[3] See, also, *First Federal Savings & Loan* v. *Dept. of Business Regulation* (Fla. App. 1985), 472 So. 2d 494, wherein the court held that a lender who had acquired deeds in lieu of foreclosure was not subject to civil penalties for failing to file certain documents required by Florida statutes to be filed by the condominium developer prior to sale of the units. The court held that the statutes did not apply to the lender where the lender did nothing to advertise or solicit buyers and the sales were not in the ordinary course of the lender's business. The lender was merely conducting a salvage operation. The court rejected the department's contention that the lender became a "second developer."

profit or proprietary interest. Affirmative answers to these considerations should be balanced against the strong policy consideration of not imposing developer obligations upon banks and other lending institutions that are in the process of salvaging a security interest.

A review of the record in the instant case supports the trial court's determination that First Federal took steps to do much more than merely preserve its security interest in Anchor Pointe. Plaintiffs' Exhibit 3 is an agreement between First Federal and Anchor Pointe Marina Corporation ("APMC"), an enterprise controlled by Virgil Gladieux. This agreement was signed on January 24, 1985, approximately one month before the vote on the Third Amendment. The agreement provides that First Federal will retain APMC as association manager of the marine complex for three years and pay fifty percent of the salary of a general manager chosen by APMC. (Item 3.) APMC is named the exclusive sales agent for all of First Federal's property at the complex with the additional provision that First Federal, after paying a seven percent real estate commission and ordinary selling expenses, will receive one hundred percent of the net proceeds. (Item 4.)

Thus, First Federal will receive a profit on any sales made by APMC. First Federal will receive a substantial profit if APMC exercises its option to buy the property remaining at the end of the three-year term. The purchase price agreed upon is four million dollars minus the full purchase price credit for any water slip sold and any profit received by First Federal from the operation of any of the leased businesses at the complex. (Item 14.) Profits earned from the leased businesses will be paid to First Federal and First Federal agrees to provide a reasonable amount for initial working capital, including a one million dollar line of credit for boat sales and service provided to APMC or an entity of APMC's choice (Items 7 and 12).

It is clear from a close reading of the agreement that First Federal did more than merely act to preserve its security interest. The record clearly supports the trial court's finding that First Federal attempted to develop the Anchor Pointe complex and participate in and profit from the condominium business. The close supervisory relationship with Gladieux and APMC established by their agreement dictates a finding that First Federal was "* * * a financial institution [acting] for the purpose of facilitating the sale of or the development of the remaining or unsold portion of the property," as contemplated by R.C. 5311.01(N).

Furthermore, First Federal cannot insulate itself from the role of developer by entering into this type of agreement with a third party (Gladieux Enterprises) whose responsibility is to develop and promote the condominium complex. Although there are circumstances where a lender may legitimately hire a third party to preserve its interest, in the instant case, plaintiffs' Exhibit 3 reveals an aim to jointly develop and profit from the operation of the condominium complex.

Appellants argue in the alternative that the board was legally constituted when it was elected at the March 8, 1984 meeting pursuant to Section 4, Article VII of the Declaration of Condominium Ownership. Section 4 provides:

"Within thirty days after the earlier of (A) five years from the date of the establishment of the Association, or (B) the sale and conveyance, to purchasers in good faith and for value, of Units to which 75% of the undivided interests in the Common Areas appertain, the Association shall meet and all Unit owners, including the Declarant,

shall elect nine Directors to replace all of those Directors earlier elected or designated by the Unit owners or Declarant, respectively, and elect new officers of the Association.* * *"

We agree with the trial court's finding that Section 4(A) of Article VII contravened the statutory requirements of R.C. 5311.08(C). R.C. 5311.08(C) provides, in relevant part:

"Not later than the time that condominium ownership interests to which twenty-five per cent of the undivided interests in the common areas and facilities appertain have been sold and conveyed by the developer in a condominium development, the unit owners association shall meet and the unit owners, other than the developer, shall elect not less than twenty-five per cent of the members of the board of managers. Not later than the time that condominium ownership interests to which fifty per cent of the undivided interest appertain have been sold and conveyed, such unit owners shall elect not less than thirty-three and one-third per cent of the members of the board of managers. * * *"

Section 4(A) of Article VII is patterned after R.C. 5311.08(D), which states:

"*Except as stated in division (C) of this section,* the declaration of a condominium development may authorize the developer or persons designated by him to appoint and remove members of the board of managers and other officers of the unit owners association and to exercise the powers and responsibilities otherwise assigned by law or the declaration to the unit owners association, the board of managers, or other officers. Such an authorization may extend from the date of the establishment of the unit owners association until the earlier of:

"(1) Five years, in the case of a condominium development the declaration of which includes expandable condominium property, or three years in the case of other condominium developments;

"(2) Thirty days after the sale and conveyance of condominium ownership interests to which appertain seventy-five per cent of the undivided interests in the common areas and facilities to purchasers in good faith for value." (Emphasis added.)

R.C. 5311.08(D) specifically provides that its provisions apply if the conditions provided in R.C. 5311.08(C) are not met. Thus, once twenty-five percent of the units have been sold, R.C. 5311.08(D) cannot come into effect. To read subdivision (D) in any other way would be to allow the unit owners to assume at least partial control of the association and then to return that control to the developer at the end of five years.

As the trial court pointed out, the obvious purpose of such requirements of R.C. 5311.08(C) is to ensure that unit owners gradually assume control of the association from the developer. Section 4(A), absent the limitation of R.C. 5311.08(C) as provided in R.C. 5311.08(D), would defeat this purpose if a majority of the units were still owned by the developer, as is the case herein. For these reasons, we adopt the reasoning and holding of the trial court with respect to Section 4(A), Article VII.

Finally, appellants contend that the board of directors was legally constituted under Section 4(B), Article IV. This contention is based on the claim that the transfer of the unsold water slips to Port Lawrence Title and Trust Company as trustee for the benefit of First Federal was a good faith transfer for value. As previously discussed, the bulk transfer to First Federal was not a sale as defined in R.C. 5311.01(N).

Thus, the trial court did not err in finding that the Anchor Pointe board was illegally constituted when the

special meeting of February 27, 1985 was called. It necessarily follows that the Third Amendment adopted at that meeting was null and void.

Appellants maintain that, regardless of the improperly constituted board of directors, First Federal, as a developer, could have appointed five of the nine directors. Since the amendment was unanimously presented to the association and could have still been presented by a majority, appellants contend that it makes no difference that the board was improperly constituted. This position ignores the fact that First Federal, with over sixty percent of the voting power, voted for all nine of the directors. Had the unit owners, other than First Federal, been permitted to vote for the four directors, as provided for in the declaration, this amendment may not have been unanimously presented to the association.

Although only six First Federal employees were elected, First Federal cast its votes for all nine directors. Thus, even though three of the nine were individual unit owners, they were not elected by unit owners other than the developer, as required by both R.C. 5311.08(C) and the declaration. The casting of votes for all nine of the directors by First Federal tainted both the election and the board.

The unanimous presentation of the amendment quite possibly affected the association's vote. If a member of the board who had been elected only by the purchasers of the units had objected to the amendment, a different result may well have ensued. To assume that if only five members of the board, who could properly be appointed by First Federal, had presented the amendment it still would have received the same seventy-seven percent approval is speculative. Moreover, it ignores the fact that the individual unit owners

were denied their absolute right to elect four of the directors.

Additionally, we note that the Third Amendment which provided for the long-term leases with Gladieux, in effect, authorizes the developer to retain control of the common areas in violation of R.C. 5311.25(B). R.C. 5311.25(B) states that the condominium instruments must provide, with certain exceptions not applicable here, that a developer may not retain a property interest in any of the common areas and facilities except such interest it may have in an unsold unit.

Appellants would have us subvert the clear purposes of the code in approving the board's Third Amendment to the condominium declaration and its contracts with the Gladieux interests. The retention of property interests in the common areas is clearly prohibited by R.C. 5311.25(B) and (C) after control of the development is assumed by the unit owners association. The leases are part and parcel of the contract with Gladieux. Appellants would have us thwart the obvious intent of the statute by sanctioning the amendment and the contracts while practical control of the association remains in the hands of First Federal and its partners in what would amount to a joint venture.

R.C. 5311.25(C) states that the condominium declaration must require that owners of condominium units sold by the developer assume control of the common areas and of the unit owners association as provided by R.C. 5311.08(C).

In any case, the Gladieux contract is unenforceable since R.C. 5311.25(D) states that "[n]either the unit owners association nor the unit owners will be subject to any management contract or agreement executed prior to the assumption of control required by division (C) of this section for more than

one year subsequent to that assumption of control unless such a contract or agreement is renewed by a vote of unit owners pursuant to the bylaws required by section 5311.08 of the Revised Code." Such a vote has never taken place nor does the contract provide for such action.

This holding does not invalidate other actions of the board of directors taken during the period from March 8, 1984 through February 27, 1985 in the ordinary course of business. As stated by the court of appeals in *State, ex rel. East Cleveland Democratic Club, Inc.,* v. *Bibb* (1984), 14 Ohio App. 3d 85, 14 OBR 99, 470 N.E. 2d 257, paragraph six of the syllabus:

"When a corporate election is subsequently declared invalid, duly elected officers remain as holdover officers until the next valid election."

Thus, actions taken by the board of directors in the ordinary course of business will survive a challenge thereto.

The judgment of the court of appeals is affirmed in part and reversed in part.

*Judgment affirmed in part and reversed in part.*

COOK, SHANNON and WRIGHT, JJ., concur.

SWEENEY and DOUGLAS, JJ., dissent with opinion.

H. BROWN, J., dissents.

COOK, J., of the Eleventh Appellate District, sitting for LOCHER, J.

SHANNON, J., of the First Appellate District, sitting for HOLMES, J.

DOUGLAS, J., dissenting. I respectfully dissent and write separately to express my concerns.

In 1980, Condo Marine Properties, Inc. ("Condo") became the developer of five hundred seventy-four water slips. Pursuant to R.C. Chapter 5311, the water slips were to be sold as condominiums. First Federal Savings and Loan Association of Toledo ("First Federal") loaned money to Condo to develop and market the project, receiving, in return, a mortgage on the property involved. Condo defaulted on the mortgage and First Federal received, in the name of a trustee, a deed in lieu of foreclosure. This conveyance gave First Federal ownership of three hundred sixty-two of the water slips out of the original five hundred seventy-four, two hundred twelve having been previously sold by Condo.

The conveyance for the benefit of First Federal took place on February 3, 1984. On March 8, 1984, a special meeting of the unit owners of Anchor Pointe Boat-A-Minium Association, Inc., the association of owners organized pursuant to the Declaration of Condominium Ownership, was called for the purpose of electing the directors of the association. At this meeting, First Federal, as owner of three hundred sixty-two units, cast votes for all nine of the directors to be elected. Six employees of First Federal were elected to the nine-person board. The other three directors elected were apparently individual water slip owners. This board, as constituted, functioned without objection throughout 1984, taking a number of corporate actions.

Pursuant to notice dated February 15, 1985, a special meeting of the members of Anchor Pointe Boat-A-Minium was called for February 27, 1985. Enclosed with the notice was a copy of a proposed Third Amendment to Declaration of Condominium Ownership. Article XVI of the declaration provides for the power to amend the

14

declaration and requires, *inter alia*, that the consent of *unit owners* exercising not less than seventy-five percent of the voting power of unit owners must be obtained for an amendment to be approved. At the February 27, 1985 meeting, over seventy-seven percent of the voting power of unit owners cast favorable votes for the amendment. This percentage exceeded by some twelve percent the voting power controlled by First Federal. Obviously, a substantial number of the other individual water slip owners voted in favor of the Third Amendment. It was *not* the board of directors, which the majority holds was improperly constituted, that approved the amendment. The amendment was approved by the vote of a vast majority of those owning individual units. Thus, it must be determined whether the "bulk transfer" of the three hundred sixty-two units gave First Federal the right to vote the interests represented by those units.

R.C. 5311.01(I)(2) defines a "unit" as "* * * a part of the condominium property consisting of the land under a portion of the water in a water slip * * * and designated as a unit in the declaration and delineated on the drawings * * *." R.C. 5311.01(J) defines a "unit owner" as "* * * a person who owns a condominium ownership interest in a unit." "Person" is defined in the declaration as "* * * a natural individual, *corporation,* * * * or other legal entity capable of holding title to real property."[4] (Emphasis added.) R.C. 5311.01(L) defines "unit owners association" as "* * * the organization of all the owners of units in a condominium property that administers the condominium property."

R.C. 5311.08(C) provides, in part, that "[m]embership in the unit owners association shall be limited to unit owners, and all unit owners shall be members." R.C. 5311.22(A) says that "[u]nless otherwise provided in the declaration, *each unit owner* of a condominium property may exercise that percentage of the total voting power of all unit owners on any question for which the vote of unit owners is permitted or required that is equivalent to the percentage of interest in the common areas and facilities appurtenant to his unit." (Emphasis added.) Nowhere in any of these sections do we find any restriction or qualification concerning the method of acquisition of ownership. Thus, the owner of a unit has the right to vote his fractional share on any issue where unit owners' votes are permitted or required. This is the authority First Federal exercised in voting its three hundred sixty-two fractional interests at both the March 8, 1984 meeting where directors were elected and the February 27, 1984 meeting where the Third Amendment was approved by the unit owners.

Having established that First Federal was the owner of three hundred sixty-two individual units, the question becomes whether First Federal obtained these units by a "sale and conveyance" or whether the transfer to First Federal, by deed in lieu of foreclosure, was some other transaction not quantified, identified or described by either appellees or the majority opinion. The majority opinion states near its ending, "* * * [a]s previously discussed, the bulk transfer to First Federal was not a sale as defined in R.C. 5311.01(N)." A reading of the opinion reveals only limited

---

[4] R.C. Chapter 5311 does not define the term "person." But, see, R.C. 1701.01(G), which defines "person" as including "* * * without limitation, a *corporation,* whether nonprofit or for profit, a partnership, an unincorporated society or association, and two or more persons having a joint or common interest." (Emphasis added.)

discussion of the issue. Be that as it may, the parties raise the issue and it needs to be explored in some depth. If appellees are correct that the transfer to First Federal by Condo was not a "sale and conveyance," then it is arguable that under R.C. 5311.08 and Section 4, Article VII of the declaration, First Federal would not have been entitled to vote for directors. Of course, such a holding would prevent First Federal from voting on any matter even though it owns three hundred sixty-two fractional interests. What a curious result. Can this really be what R.C. 5311.01(N) contemplated? I think not.

Before discussing R.C. 5311.01(N), it is first necessary to review other pertinent sections of the Revised Code and the declaration. Did the transfer to First Federal through a deed in lieu of foreclosure constitute a "sale and conveyance" to a purchaser "in good faith" and "for value" within the meaning of Section 4, Article VII of the Declaration of Condominium Ownership and R.C. 5311.08(D)(2)? The questions of whether the transfer to First Federal was a "sale and conveyance" and whether the units were "sold and conveyed" to First Federal are crucial because if the transfer did fall within the contemplation of these provisions, then First Federal was entitled to participate as fully as it did in both the March 8, 1984 and February 27, 1985 voting and the board of directors was properly constituted and the amendment lawfully approved.

Section 4, Article VII of the declaration provides in pertinent part:

"Within thirty days after the earlier of (A) five years from the date of the establishment of the Association, or (B) *the sale and conveyance, to purchasers in good faith and for value,* of Units to which 75% of the undivided interests in the Common Areas appertain, the Association shall meet and *all Unit owners,* including the Declarant, shall elect *nine Directors* to replace all of those Directors earlier elected * * *." (Emphasis added.)

The event described in (B) would transpire earlier than that described in (A) if the transfer to First Federal was a "sale and conveyance" to a purchaser "in good faith and for value," since that transfer brought the number of units sold to one hundred percent, on a date less than five years from the date of the establishment of the association.[5] This is exactly the same situation as provided for in R.C. 5311.08(D) (1) and (2).[6] For the following reasons, I am completely persuaded that the transfer to First Federal qualifies as a "sale and conveyance" to a purchaser " in good faith and for value."

First, the transfer by the developer, Condo Marine Properties, Inc., through a deed in lieu of foreclosure, was clearly a "sale and conveyance" as that term is commonly understood. Black's Law Dictionary (5 Ed. 1979) defines a "sale" as "[a] contract whereby property is transferred from one person to another for a consideration of value, implying the passing of the general and absolute title, as distinguished from a special interest falling short of complete ownership." *Id.* at 1200. The transfer herein plainly

---

[5] The unit owners association in the instant cause appears to have been established concurrently with the recordation of the Declaration of Condominium Ownership, on January 24, 1980. The transfer to First Federal, by which the total units sold climbed over the seventy-five percent mark, occurred on February 3, 1984. At that point, therefore, five years had not yet passed since the establishment of the association.

[6] See discussion regarding R.C. 5311.08(D), *infra.*

falls within this definition. The parties contracted to pass complete title from one to the other for a consideration of value, namely, the release of the seller-grantor-mortgagor (Condo Marine Properties, Inc.) from all liability on the remainder of *its* debt owed to the buyer-grantee-mortgagee (First Federal).

The transfer also constituted a sale and conveyance to a purchaser "in good faith and for value." No one pretends to maintain that this transaction was in anything but complete good faith. As explained above, the transfer was indeed "for value." Such value was given in the form of First Federal's agreement to discharge the debtor from its obligation on the debt.

It thus appears, by the terms of the declaration and pursuant to R.C. 5311.08(D)(2), that First Federal had a clear right to participate fully in the March 8, 1984 election and the February 27, 1985 amendment process since the transfer to First Federal was a "sale and conveyance" to a purchaser "in good faith and for value."

The only way that the transfer in question would not be a "sale" is by the application of R.C. 5311.01(N). This section exempts from its definition of "sale of a condominium ownership interest" a transfer of two or more units from the developer to "* * * a financial institution for the purpose of facilitating the sale of or the development of the remaining or unsold portion of the property." Since this was the precise purpose of First Federal in acquiring the property from Condo, it would appear that the transfer could not be a "sale, " and the foregoing analysis concluding that it was in fact a sale would collapse. However, upon review and research, it becomes clear that R.C. 5311.01(N) was designed for a very specific purpose, a purpose which would not be furthered by application to the instant transfer.

This goal has been aptly described as follows:

"This distinction [between individuals purchasing the units for purposes of residing thereon, on the one hand, and developers and financial institutions, on the other] is in keeping with the general consumer protection nature of * * * [H.B. No. 404, which amended R.C. Chapter 5311]. Commercial entities are presumably on an equal bargaining basis with each other and do not need the protections that an individual consumer would when dealing with a commercial entity." Note, An Amendment to Ohio's Condominium Act (1979), 4 U. Day. L. Rev. 503, 506-507, at fn. 30. This purpose becomes even clearer when it is realized that R.C. 5311.01(N) was added to the Revised Code as part of the 1978 amendments to the 1963 Ohio Condominium Act. Added also were R.C. 5311.25 and 5311.26, other new and extensive consumer protection provisions.

Thus, it is clear that the definition of "sale of condominium ownership interest" in R.C. 5311.01(N) was designed to trigger the consumer protection provisions of R.C. Chapter 5311, and exempts certain transactions from its application because consumers are not involved and the protections are not necessary. The purpose of R.C. 5311.01(N) is to determine when, for instance, the warranties set forth in R.C. 5311.25 and 5311.26 are operative. The use of R.C. 5311.01(N) should therefore be limited to situations where a determination must be made of whether consumer protection needs arise. It was not intended to alter the traditional notion of what constitutes a sale in every situation and for every purpose. In the instant cause, we are not confronted with the question of whether First Federal should assume the duties imposed on a developer under R.C. 5311.25 and 5311.26,

although the assumption of those duties is the practical result of the majority decision. Appellees choose to make the sole question before this court one of whether the transfer at issue was a "sale and conveyance" to a purchaser "in good faith and for value" *for purposes of determining whether First Federal had a right to vote for all nine directors at the March 8, 1984 meeting.* For this purpose, the traditional definition of "sale" is relevant, and not the definition set forth in R.C. 5311.01(N). Using the traditional meaning of "sale," the transfer at bar clearly qualifies as such, as discussed *supra.*

Appellees contend, however, that the transfer to First Federal was not, under these circumstances, "a sale and conveyance." In support of this position, appellees cite *Foster* v. *Daon Corp.* (C.A. 5, 1983), 713 F. 2d 148. A reading of the *Foster* opinion quickly reveals that the holding therein is not pertinent here. In *Foster,* the court was interpreting a minimum price provision in a contract for sale of a condominium unit. This provision entitled Foster to compensation in the event that any other unit in the complex sold for less than the price per square foot paid by Foster for her unit, until such time as the seller "conveyed" all of the units in the complex. The court interpreted the term "conveyed" as *not* including a transfer of all remaining units by the seller to one of its subsidiaries. This scenario is patently distinguishable from the case before us. In *Foster,* the court was faced with the use of the term "conveyed" *in a contract clause* which had the *specific purpose* of guaranteeing the buyer the minimum price for her unit. Obviously, the court's interpretation of that term was fashioned with the goal of advancing that purpose. Its interpretation is not relevant in every context. The facts at bar do not warrant the adop-

tion of the *Foster* holding, since the context is materially different. The transfer in *Foster* could not be allowed to circumvent the price protections guaranteed to the buyer therein, who bought her unit shortly before the transfer took place and without notice of the seller's intentions. Here, none of the contractual rights of previous buyers is altered or abridged by the transfer to First Federal. There is certainly no attempt to defraud such buyers, nor are they in fact affected in any way. *Foster* does not apply and thus forms no foundation for a holding that the transfer in question here was not a sale and conveyance.

The only remaining argument presented by appellees, and vigorously argued in the majority opinion, is that First Federal became a "developer" upon its acquisition of the mortgaged sites in default. While R.C. Chapter 5311 does, where appropriate, use the term "developer," the condominium declaration herein uses only the term "declarant" to describe the person or entity involved in promoting the development. Appellees contend, and the majority opinion agrees, that First Federal became a "developer" when it took back the mortgaged property. To be the "developer" of this project First Federal would have to, among other things, step into the shoes of the "declarant." In so holding, the majority must ignore, as it does, Item 11 of the definitional section of the declaration which states that " '[d]eclarant' means Condo Marine Properties, Inc., a Michigan corporation, and its successors and assigns, *provided the rights specifically reserved to Declarant* under the Condominium organizational documents *shall accrue only to such successors and assigns as are designated in writing by Declarant* as successors and assigns of such rights." (Emphasis added.) There is no contention here that First Federal was

or is a "successor" corporation of Condo nor is there any assertion that the "rights specifically reserved to Declarant" have been conveyed to anyone, including First Federal, through a designation in writing by Condo. Why does the majority not mention Item 11 as set forth in the declaration? The answer is simple. To recognize that it exists would summarily defeat the argument that First Federal could be a "developer" of this project.

Even considering this, there are yet better reasons why First Federal is not a "developer." R.C. 5311.01(T) defines "developer" as "* * * [a]ny person who, directly or indirectly, sells or offers for sale condominium ownership interests in a condominium development. 'Developer' includes the declarant of a condominium development and any successor to the declarant who stands in the same relation to the condominium development as the declarant."

The majority contends that First Federal is a developer and therefore was entitled to appoint only five, instead of vote for all nine, board members.[7] Respectfully, the majority's analysis misses the mark.

First, the majority finds that, although First Federal's acquisition of the units in question did not automatically cast it in the role of developer, First Federal eventually assumed that role by becoming "so in-

tertwined with the promotion and development of the property" that it in effect "engaged in the business of the developer." How does the majority reach that conclusion? According to the majority, First Federal (a) hired an agent to manage the property and (b) assured itself of a profit from unit sales. From these humble beginnings, the majority leaps to the conclusion that First Federal somehow intended to "develop" the property "jointly" with the agent. Actually, the lender was attempting, in perfectly good faith, to *divorce itself* from the management, promotion and sale of the property, a business in which lenders do not commonly participate. In entering into the agreement, First Federal, contrary to the protestations of the majority, was attempting to cut its eventual overall loss on the defaulted loan which it certainly had every right to do. If a procedure, such as employed by First Federal under these circumstances, does not meet the majority's conditions to avoid being a developer, then the question arises as to what possible course of action the majority would recommend to First Federal to protect its investment without incurring the massive and totally uncontemplated responsibilities of a developer. By making First Federal a developer, the majority imposes on it (I am sure to the great surprise of First Federal and to the inevitable surprise of many similarly situated financial in-

---

[7] Given the holding of the majority, this is a curious position. The majority seems to hold that the amendment was not properly before the association members for consideration on February 27, 1985 because it was proposed by a board that was illegally constituted, *i.e.*, that First Federal had elected six members. It is difficult to understand what difference, even if accurate, this makes. There is nothing in the statute or declaration that would prohibit a

simple majority of the board from presenting an amendment. Since the majority opinion concedes that under any circumstances First Federal, as a developer, would have power to appoint five members of the board, and the amendment in question was *unanimously* presented to the association membership, it is difficult to see how the board was improperly constituted or the amendment improperly submitted.

stitutions and other financiers) a staggering number of duties. A *mere sampling* of such duties includes:

(1) A two-year warranty "covering the full cost of labor and materials for any repair or replacement of roof and structural components, and mechanical, electrical, plumbing, and common service elements serving the condominium property or additional property as a whole, occasioned or necessitated by a defect in material or workmanship," and a one-year warranty "covering the full cost of labor and materials for any repair or replacement of structural, mechanical, or other elements pertaining to each unit, occasioned or necessitated by a defect in material or workmanship * * *." R.C. 5311.25(E).

(2) A full and accurate disclosure to each prospective purchaser by a written statement of "all material circumstances or features affecting the development," which statement *must* contain the matters set forth in R.C. 5311.26(A) through (O) including, but not limited to: (a) a statement of the status of construction, zoning, site plan or approvals, and compliance with all applicable federal, state or local statutes and regulations; (b) a description of warranties; (c) a two-year projection, revised and updated every six months, of annual expenditures necessary to operate and maintain the project, including taxes, insurance, utilities, assessments, fees, and any other expenses and costs, and the formulas for such projections; and (d) a statement of significant provisions for management of the units, including conditions for the formation of a unit owners association, its contractual rights and responsibilities, and the apportionment of voting rights among association members. See R.C. 5311.26(B), (C), (F) and (H).

Failure to comply with these or any of the other numerous requirements will expose the developer to personal liability and will give any purchaser the right to void the contract of sale. R.C. 5311.27(A) and (B).

What authority does the majority rely on to bring about this result? The majority tells us to look at *Chotka* v. *Fidelco Growth Investors* (Fla. App. 1980), 383 So. 2d 1169, and *First Federal Savings & Loan* v. *Dept. of Business Regulation* (Fla. App. 1985), 472 So. 2d 494. So I did! What one finds, when one reads the cases, is that they do not support the majority's position at all. The case before us involves *voting* for a condominium association's board of directors and *voting* on an amendment to a declaration. The Florida cases, which, incidentally, interpret the Florida condominium statutes, a much more detailed[8] pronouncement, have nothing to do with voting. *Chotka, supra,* merely holds that "* * * appellees became a developer of the project to the extent that they may be held liable for performance of express representations made to the buyer, for patent construction defects in the entire condominium project and for breach of any applicable warranties due to defects in the portions of the project completed by appellees." *Id.* at 1170. *Dept. of Business Regulation, supra,* is even less helpful to the majority herein and, in fact, supports the

---

[8] As an example, "developer" is defined in the former Florida statute as "a person who *creates* a condominium or offers condominium parcels for sale or lease *in the ordinary course of business,* but does not include an owner or lessee * * * who has acquired his unit for his own occupancy * * *." (Emphasis added.) Fla. Stat. Section 718.103(13), now (14).

position of appellant. That case holds that a savings and loan association, which took deeds from a condominium developer in lieu of foreclosure and sold the units, did not thereby become a "developer" for purposes of a Florida statute requiring developers to file certain documents furnished to the buyer. Clearly, these cases do not support the majority's holding that appellant, First Federal, is a developer under these facts.

Even more disturbing is the fact that these uncontemplated consequences of our decision are not limited to the imposition of these duties on financial institutions accepting a deed in lieu of foreclosure. Under the analysis advanced therein, *any person* who sells or offers for sale ownership interests in a condominium development is a developer, and thereby incurs all the responsibilities of a developer as outlined in R.C. 5311.25 and 5311.26. Surely the legislature did not intend to inflict this burden on private individuals who buy several units and then offer them for sale in the hope of enjoying a modest profit. Yet today's opinion, whether we realize it or not, brings about this result.

There are yet additional difficulties I find with the majority opinion. The majority finds that Section 4(A), Article VII of the Declaration of Condominium Ownership contravenes the statutory requirements of R.C. 5311.08(C). In so holding, the majority asserts that the obvious purpose of the statute is to ensure that unit owners gradually assume control of the association from the developer and that Section 4(A) "defeat[s] this purpose."

R.C. 5311.08 contains more than just subsection "(C)." A close comparison of Section 4, in its entirety, with R.C. 5311.08 *in its entirety,* reveals that Section 4 differs from the statute only to the extent of being *more liberal toward unit owners,* which is, of course, a perfectly acceptable variation. The only way one could believe that the portion of Section 4 quoted in the majority opinion "contravene[s]" R.C. 5311.08(C) is if R.C. 5311.08(*D*) did not exist. A comparison of the same segment of Section 4 with subsection (D) of the statute reveals that they are nearly identical. How, then, can Section 4(A) "contravene" the statute?

The majority sees Section 4(A) as "defeating the purpose" of the statute which is to shift control of the association from the developer to the unit owners. This it most assuredly does *not* do. The following synopsis of Section 4 demonstrates that it *advances* rather than defeats this purpose.

The section provides that, at the time of declaration, the developer (declarant) shall name all nine members of the board. Once twenty-five percent of the units have been sold, the unit owners, other than the developer, shall elect four of the nine directors. The next shift in control takes place when either five years have passed since the date of the association's establishment, or when seventy-five percent of the total units have been sold and conveyed to good faith purchasers for value, whichever is the earlier of these two events.[9] At that point, according to Section 4, all unit owners, including the developer, shall

<hr>

[9] At the time the transaction in question took place, five years had not yet passed. Now, however, even if the majority's position is accepted as correct, First Federal, whether it is a developer or an owner of individual units, may vote for

*all* members of the board and for any proposed amendment. The reason for this is that five years from the date of the establishment of the unit owners association have now passed and both the statute *and* the declaration give all unit owners, in-

vote for a new group of nine directors. At this juncture, the developer loses whatever preference his developer status previously gave him, and votes just like any other unit owner. He no longer can appoint or designate any of the directors. His voting power is limited by the number of units owned by him, in the same way as every other unit owner. It is difficult to see how this defeats the purpose of gradually moving control into the hands of the unit owners. The conclusion that Section 4(A) "contravene[s]" R.C. 5311.08(C), when it is R.C. 5311.08(D) that the section was designed to adopt, is inaccurate.

The majority's statement that "R.C. 5311.08(D) specifically provides that it only applies if the conditions provided in R.C 5311.08(C) are not met" is incomprehensible. To which "conditions" is the majority referring? Under what circumstances are these conditions "met" such that subsection (D) of R.C. 5311.08 may apply? According to the majority, "once twenty-five percent of the units have been sold, R.C. 5311.08(D) cannot come into effect." This statement is simply wrong. How can R.C. 5311.08(D) fail to apply once twenty-five percent of the units have been sold when the section itself provides that it may apply until *seventy-five percent* of the units are sold?

In apparent justification of this erroneous conclusion, the majority asserts that "[t]o read [R.C. 5311.08](D) in any other way would be to allow the unit owners to assume at least partial control of the association and then to return that control to the

developer at the end of five years." It is with this statement, perhaps more than with any other in the opinion, that the majority reveals the depth of its confusion in this case.

R.C. 5311.08(D), *when read as written,* merely provides that the developer may, subject to the limitations set forth in subsection (C) of R.C. 5311.08, appoint members of the board of managers until the earlier of two described events has occurred. The number of board members the developer may appoint is limited by the provisions of (C) in that as more units are sold, the voting power of the unit owners increases and the developer's power to appoint decreases. To say that (D) does not apply once twenty-five percent of the units are sold is to say that the remaining seventy-five percent of the seats on the board may remain vacant, since at that point, unit owners may vote only for a minimum of twenty-five percent. If R.C. 5311.08(D) does not apply, then who designates the rest of the board? This is exactly the purpose for which (D) was designed. The majority's further statement that subsection (D), when read "in any other way," returns control to the developer at the end of five years is likewise difficult to understand. In fact, R.C. 5311.08(D) expressly and unequivocally *terminates* the developer's power to appoint after five years. The result of the majority's misguided conclusion is that subsection (D) is effectively written out of existence.

I am baffled by the majority's conclusion that the Gladieux contract is "unenforceable" under R.C. 5311.*25*

---

cluding declarant, the right to vote for all nine directors and neither section is limited by the words "sale and conveyance." R.C. 5311.08(D) and Paragraph 2, Section 4 of Article VII. Thus, it would appear, First

Federal may now proceed, as it previously did, without limitation except as provided in Article XVI of the declaration, in spite of the majority decision.

*(D)*, which provides that the unit owners and the unit owners association are not bound by any contract executed prior to the unit owners' assumption of control for more than one year following such assumption of control unless the contract is renewed. What the majority fails to realize is that this provision has not yet been triggered in this case. In fact, a great deal of what is wrong with the majority opinion may be traced to its erroneous assumption that the unit owners have assumed control of the unit owners association. This is simply not true, either under the statutes or the declaration. Even accepting the majority's mistaken conclusion that First Federal is a developer under these facts, the unit owners have not yet assumed control under R.C. 5311.08(C). Only 36.9 percent of the units (two hundred twelve of five hundred seventy-four) are out of the hands of the "developer." Under R.C. 5311.08(C), this means that the unit owners may vote for a minimum of only twenty-five percent of the association's board of directors. This can hardly be characterized as "assumption of control." Nor does the absolute five-year limitation on the developer's power of appointment contained in R.C. 5311.08(D) mean that the unit owners now "control" the association. Their voting power is still limited by the number of units they own, which in this case amounts to only 36.9 percent. First Federal owns the remaining 63.1 percent of the units, and until a majority of the units are out of the hands of the developer (as the majority has chosen to characterize First Federal), the unit owners will not control the association. Thus, the majority's conclusion that the Gladieux contract is "unenforceable" since control of the association has been assumed by the unit owners is based on a totally erroneous premise, and cannot withstand scrutiny.

Finally, in citing R.C. 5311.25(D) in support of its position that the Gladieux contract is unenforceable, the majority, once again, has conveniently ignored parts of the statute, to wit: subsections (B) and (C) of R.C. 5311.25 which, when read, make clear the fallacy of the majority's contention.

Furthermore, the real question here is the validity of the Third Amendment. It is interesting to note that the majority opinion does not, in detail, discuss the actual vote on the amendment. There would seem to be a good reason for this. Pursuant to Article XVI of the declaration, whether First Federal is a developer or an owner of individual units, it certainly would have the right to vote for amendments. Considering the previous discussion herein regarding the definitions of "unit," "unit owner," "person" and "unit owners association" and the rights given each unit owner by R.C. 5311.22(A), it should be clear that First Federal had the right to vote for the amendment as an owner of units regardless of how it acquired ownership since there is, once again, no "sale and conveyance" limiting language in Article XVI. Joining with other owners, First Federal cast its sixty-five plus percent of par value ownership votes to approve the amendment which received 77.15 percent favorable votes — more than the seventy-five percent required.

I write at length on this case because of my concern that the majority is naively plowing ground from which only a bitter crop can grow. It is my judgment that, except for sure things, the condominium construction market could be at an end. When financiers, supporting condominium projects in this state, discover what obligations this court has placed upon

them when they find it necessary to repossess the property in a project where the mortgage is in default, who will be prepared to take the risk? To say, as the majority opinion does, that "First Federal will receive a substantial profit if APMC exercises its option to buy the property remaining at the end of the three-year term" is to be either unaware of the realities of the foreclosure market or to ignore those realities in the hope that they will just fade away. Neither reason is acceptable and is, in fact, dangerous when we are dealing with an industry in this state as basic as our construction financing industry. The decision of the majority will profoundly and adversely affect the interests of not only those who have invested in condominiums but also those who have provided the necessary financing for condominium projects in this state. To say that all of this is frightening is an understatement.

The sad part of what we do today is that it is so unnecessary. Condominium declarations are covenants that run with the land. Each prior and future purchaser of a unit is protected both by statute and by the declaration as to ownership and use of the property. Section 1(A), Article XVI of the declaration requires the *consent* of *all* unit owners before there can be *any amendment* bringing about a *change* in "(I) the boundaries of any Unit; (II) the *undivided interest in the common areas* appertaining to a Unit or the liability for common expense appertaining thereto; (III) the number of votes in the Association appertaining to any Unit; or (IV) the *fundamental*

*purposes* to which any *Unit* or the *Common Areas* are restricted." (Emphasis added.) Thus, to change the fundamental purpose of the project or to change any unit owner's undivided ownership interest in the project takes the *unanimous* consent of all unit owners.

What First Federal has sought to do here with the thirty-year lease that seems to be of such great concern, is to provide the amenities necessary to make the entire project successful.[10] What First Federal has proposed changes neither the fundamental purposes of the project nor any unit owner's undivided interest in the common areas. Therefore, the vote necessary to approve the amendment is seventy-five percent, pursuant to Section 1, Article XVI of the declaration, of the voting power of unit owners. The amendment, having received 77.15 percent of those unit owners eligible to vote, was properly approved.

Kenton L. Kuehnle stated in his conclusion to his 1979 article, Condominium Revision in Ohio: A Nightmare for Developers and the Courts, 9 Cap. U. L. Rev. 241, 290:

"There can be little argument that revision of the Ohio condominium statute was overdue. Unfortunately, the problems solved will, no doubt, be overshadowed by the problems created by the new statute. Immediate attention must be given to reviewing the legislation to correct these new problems. Without revision, developers proceed at their own risk, unable to obtain guidance from even the most learned counsel. *The courts will be*

---

[10] Among other things, in order to try to salvage the project, First Federal has agreed to provide a reasonable amount for initial working capital and an additional one million dollar line of credit for boat sales and service on site. This additional commitment does not sound like, at least to me, an entity seeking, through subterfuge, to harm any individual unit owner.

*forced to render questionable decisions of law.* Faced with the breadth of possible statutory interpretations, the court is likely to assess the parties' honesty and to interpret the statute to fit the court's desire to be fair. *The result will be bad case law."* (Emphasis added.)

With today's decision, the author appears to be a prophet.

Since I am firmly convinced that (1) First Federal received the property in question through a "sale and conveyance," (2) that First Federal is not a "developer," (3) that the votes at both the March 8, 1984 and the February 27, 1985 meetings were both proper and lawful, (4) that the amendment in question was, in any event, properly adopted, (5) that each individual unit owner is fully protected both by statute and the declaration, and (6) that the majority opinion is wrong, I must respectfully dissent.

SWEENEY, J., concurs in the foregoing dissenting opinion.