IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 7, 2023 Session

## HIDDEN LAKE RESORTS HOMEOWNERS ASSOCIATION, INC. v. CHARLES Z. MOORE ET AL.

**Appeal from the Chancery Court for Cheatham County**
No. 16577      David D. Wolfe, Chancellor

_____

### No. M2022-01323-COA-R3-CV

_____

This appeal arises out of a dispute between the homeowners' association for a planned development and the successor owner of the development over the obligations of the successor owner. We agree with the trial court's ruling that the successor owner assumed all of the previous owner's rights and responsibilities as the declarant under the development's recorded restrictive covenants. We affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which KENNY W. ARMSTRONG and JEFFREY USMAN, JJ., joined.

Roger Alan Maness and Mark Allen Rassas, Clarksville, Tennessee, for the appellant, Charles Z. Moore.

Robert L. Delaney, Mark E. Morrison, and Timothy Neil O'Connor, Nashville, Tennessee, for the appellee, Hidden Lake Resorts Homeowners Association, LLC.

Jennifer Noe, Ashland City, Tennessee, and Ross Vincent Smith, Brentwood, Tennessee, for the appellee, Town of Ashland City.

David Gilbert Schuette, Evan Stephen Rothey, and W. Scott Sims, Nashville, Tennessee, for the appellee, BancorpSouth Bank.

**OPINION**

This case involves a real estate development in Cheatham County, Tennessee, called Hidden Lake Resorts ("HLR").[1]  The original developers, Harold and Kathy Spears, purchased approximately 881 acres for the development in 2004.  The Spearses then transferred the property to an entity called Hidden Lake Resorts, LLC ("the LLC").  The purchase and subsequent development of the property were financed through loans from a bank that was later purchased by BancorpSouth Bank ("the Bank").

In June 2005, Mr. Spears recorded articles of incorporation ("the charter") for the HLR Homeowners' Association ("the HOA") as well as bylaws and a Declaration of Covenants, Conditions and Restrictions ("CCRs").  The charter provides that every person or entity owning a fee interest in any HLR lot (excluding those holding an interest as security) is a member of the HOA.  Under Article XI of the charter (concerning voting rights), class A members (all members except the declarants, as defined in the amended CCRs) are entitled to one vote for each lot owned.  The class B members (the declarants) are entitled to three votes for each lot owned.  Class B membership would cease and be converted to class A membership upon the occurrence of the earlier of the following events: (a) when the total votes outstanding in class A membership exceeded the total votes outstanding in the class B membership; or (b) within ten years from the conveyance of the first lot to an owner.  Article XV of the charter states that, "Amendment of these Articles shall require the assent of sixty-seven (67%) percent of the entire membership."

The preamble of the CCRs declares that all of the HLR properties "shall be held, sold and conveyed subject to the following easements, restrictions, covenants, and conditions, which are for the purpose of protecting the value and desirability of, and which shall run with the real property and be binding on all parties having any right, title or interest in the described properties . . . ."  "Declarants" is defined to be the LLC.  The CCRs address many topics, including the requirement that the declarants and all owners pay annual and special assessments to the HOA for each lot owned.  Article XI, section 3 addresses amendments to the CCRs, which must be done "as provided in the By-Laws" attached to the CCRs.  (The bylaws of the HOA are incorporated into the CCRs).  Section 3 further states, in pertinent part:

> Declarants hereby reserve the right unilaterally to amend and revise the standards, covenants and restrictions contained in this Declaration during the period continuing six (6) years from the date each Plat is recorded.  Such

---

[1] Most of the underlying facts in this case are undisputed on appeal.  Thus, in summarizing the relevant undisputed facts, we will rely upon the trial court's findings of fact.  Unless otherwise indicated, quotations are from the trial court's final judgment.

amendments shall be in writing, executed by Declarants, and recorded with the Register of Deeds of Cheatham County, Tennessee. No such amendment, however, shall restrict or diminish materially the rights or increase or expand materially the obligations of Owners with respect to Lots conveyed to such Owners prior to the amendment or adversely affect the rights and interests of Mortgagees holding first mortgages on Lots at the time of such amendment.

Section 4 of Article XI provides that, as long as there is class B membership, amendment of the CCRs "will require the prior approval of the Federal Housing Administration (FHA) or the Veterans Administration (VA)."

Article XIII, section 2 of the HOA bylaws provides that the CCRs may be amended during the first 20 years "by an instrument signed by not less than seventy-five (75%) percent of the Members and thereafter by an instrument signed by not less than sixty-seven (67%) of the Members." Article XIII, section 3 of the bylaws states:

Any and all amendments eligible for approval in Section 1 and Section 2 of this Article shall be subject to the following conditions and restrictions:

(a) As long as there is a Class B membership and any Eligible Mortgage Holder is the holder of any FHA or VA insured mortgage, the following actions will require the prior approval of the Federal Housing Administration (FHA) and/or the Veterans Administration (VA); Amendments to the Declaration of Covenants, Conditions and Restrictions.

(b) Amendments of a material nature must be agreed to by Members who represent at least sixty-seven (67%) percent of the total allocated votes in the Association. In addition thereto, approval must be obtained from Eligible Mortgage Holders who represent at least fifty-one (51%) percent of the votes of Lots that are subject to mortgages held by eligible holders . . . A change to any of the following shall be considered under this Section material:
   (1) Voting Rights.
   (2) Assessment, assessment liens, or the priority of assessment liens.
   . . .
   (14) Any provisions that expressly benefit mortgage holders, insurers or guarantors.

The HLR property was annexed by the Town of Ashland City ("the Town") through resolutions adopted in 2004 and 2011. The trial court described the conditions associated with the Town's annexation of the HLR property:

In order to obtain the Town's approval for annexation, Spears had to commit to meet conditions set forth by the Town's Resolutions and State law. Those requirements included, in relevant portions, that the developer would be responsible for providing water service to the property, provide sanitary sewer service to tie into the existing lines for those portions covered by the Town's Utility District, and the developer would install an on-side step-sewer system for the portion of the property which remained outside of the Utility's district. Further, the Town's Resolutions required the developer to be responsible for road and street construction, built to meet the Town's standards. Once constructed, the roads and streets would become the responsibility of the Homeowners Association. The Resolution also required the developer to provide street lighting.

During the period from 2005 until 2008, the Town's planning commission approved five plats, covering phases 1 through 5A of HLR, and these plats were duly recorded. HLR constructed the initial sewer system and obtained Town approval for a second sewer system. Unfortunately, the 2008 financial crisis occurred, and the LLC was unable to keep making payments on its debt. The Bank foreclosed on the HLR property and purchased the property from the successor trustee at the foreclosure sale in September 2011. At that time, HLR was only forty or fifty percent complete. Much of the infrastructure for the five platted phases remained unfinished. No common areas had been conveyed to the HOA, and the existing sewer system had not been deeded to the Pleasant View Utility District.

In May 2012, the LLC executed an Assignment of Development Rights ("Assignment #1") assigning its rights as declarant under the CCRs to the Bank, effective September 8, 2011. The relevant terms of this assignment will be discussed more fully in our analysis. The Bank retained the services of attorney Patricia Young "to assist in handling the development." Ms. Young discovered that, although the HOA had been incorporated and the CCRs recorded, no HOA had ever been formed. Ms. Young arranged for the first meeting of the HOA in May 2012, and the HOA elected a board. At that meeting, Ms. Young advised the HOA members present that the Bank would not be acting as a developer and would be looking for a buyer to purchase the property.

In 2013, businessman Charles Moore began negotiating with the Bank to purchase HLR. Mr. Moore and the Bank executed a Lot/Land Purchase and Sale Agreement ("the Agreement") on August 8, 2014, providing that Mr. Moore would purchase the remaining 650 acres of HLR with a closing date of October 17, 2014. As the trial court stated:

That document [the Agreement] was drafted by Mr. Moore's attorney and contained several noteworthy provisions. Those included a requirement that Moore be responsible for Homeowners Association fees; that the special warranty deed would be subject to the existing CCRs; that Moore would have sixty (60) days to perform due diligence as to the feasibility of his purchase;

that the roads and amenities serving the completed phases 1-5, belonged to the Homeowners Association; and that he had the right to perform due diligence of the streets, roadways and paving serving the five (5) phases "in accord with municipal regulations governing same." Further, it contained a provision that the Bank would cooperate and work with Moore's efforts to "clarify or revise" certain conditions in the CCRs. Any revision was required to be approved and signed by the HOA prior to closing, if the approval of the members of the Association is required by the document to be amended. Finally, the special stipulations provided that the Bank would assign to Moore those Declarant rights it holds.

Thereafter, Mr. Moore performed his due diligence, including obtaining copies of the recorded charter, CCRs, and bylaws. Mr. Moore "engaged in efforts to obtain the Town's and Pleasant View Utility District's agreement to finance and complete the construction of the roads and sewer system within Hidden Lake Resort." These efforts were not successful.

In a letter dated September 7, 2014, Richard Chappell, the HOA president, and Art Belisle, HOA board member, advised the homeowners about Mr. Moore's interest in the property and summarized a meeting with Mr. Moore and his attorney on August 20, 2014, that was attended by several board members and the HOA attorneys. That letter includes the following statement:

Two major issues need to be investigated that could impact the viability of Mr. Moore making an offer to buy our development: (1) sanitary sewer service for the rest of the development; and (2) top-coating of all the roads, while installing curbing and street lights in those phases currently without those amenities.

The minutes of a meeting of the HOA board on September 9, 2014, reflect that Mr. Chappell asked those present (five directors and five homeowners) whether they "would authorize [Mr. Chappell and Mr. Belisle] to be the spokespersons for the HOA and negotiate any deals to be made." The motion carried.

At the end of the 60-day period, Mr. Moore was not ready to close on the purchase. On October 7, 2014, the parties entered into a First Amendment to the Agreement ("First Amendment"), which reduced the purchase price to $712,000 and set the closing for October 17, 2014. We will examine in detail the sequence of events after the First Amendment.

On October 10, 2014, William Miller, attorney for Mr. Moore, emailed Spencer Hamlin, attorney for the HOA, and Ms. Young, counsel for the Bank, concerning Mr. Moore's proposed amendments to the charter and CCRs. Mr. Miller opined that the Bank, as the current owner of HLR, had the voting power to unilaterally amend both documents.

Under Mr. Moore's proposed amendments to the charter, the declarants would "be entitled to one more vote than the aggregate number of votes of all Class A owners." Moreover, class B membership would cease and be converted to class A membership "at such time as the Declarants no longer own any lots in the Development Area (as defined in the [CCRs] as amended)."

As to the CCRs, Mr. Moore's proposed amendments included a provision defining "declarants" to mean Mr. Moore and any successors in interest identified in recorded supplemental CCRs. The voting rights of class B members would be changed to be consistent with the amended charter. Article VII, section 1 (regarding HOA assessments) would be revised to relieve the declarants of any obligation to pay annual or special assessments. In addition, Article XI, section 3 (concerning amendments to the CCRs) would give the declarants "the right unilaterally to amend and revise the standards, covenants and restrictions contained in this Declaration during the period continuing ten (10) years from the date this Amendment is recorded."

Mr. Hamlin emailed Mr. Miller on October 13, 2014, to explain the HOA board's position on Mr. Moore's proposed amendments. The board was concerned about the declarant "maintaining a majority voting right even if the declarant[']s ownership interest is only one lot." Mr. Hamlin stated that: "You have asked that these changes be presented to the HOA for approval even though that approval is not necessarily needed." The board requested that, before the amendments were presented to the HOA for approval, Mr. Moore reconsider the amendment establishing an "overriding voting right of the declarant to extend into perpetuity." That same day, Mr. Moore emailed the proposed amendments to the Bank.

On the morning of October 14, 2014, Mr. Miller emailed revised proposed amendments to Mr. Hamlin. Under the revisions, Mr. Moore's voting majority (class B membership) would end when he owned fewer than ten (10) HLR lots. Mr. Miller stated that, if the board approved the amendments at its meeting that night, he would "need to get a copy of the Amendment to the Charter signed by the HOA president tomorrow."

At around noon on October 14, 2014, Ms. Young sent Mr. Miller an email in response to his October 13 email concerning the proposed amendments. She stated: "The bank will not execute the amendment." Mr. Miller asked for an explanation. Ms. Young replied that the Bank agreed (in the Agreement) to cooperate with Mr. Moore's efforts to amend the CCRs, but the Bank "does not intend to sign any documents." Ms. Young further opined: "It appears that a special [HOA] meeting should have been called for this type of action per the [CCRs], and there has been no request for such action."

The HOA board met the evening of October 14, 2014. The minutes of that meeting state:

Mr. Moore has asked the board to agree to a couple changes to the governing documents. See the attached Articles of Amendment to the Charter for details of the changes.[2] Out of the homeowners present all 7 agreed for the board to accept the amendment. A motion was made and properly seconded to accept the changes. The vote was unanimous to accept the changes.

. . .

[Mr. Chappell] reviewed the attached election changes to the By-laws and presented copies to the homeowners present for feedback. The changes would be reviewed by the attorney and the new developer before being made.[3]

The next day, Mr. Miller emailed Mr. Hamlin to inquire whether "the document is available for pick up."

In replying to Mr. Miller's request for "the document," Mr. Hamlin informed Mr. Miller in an email on October 15, 2014, of unresolved issues:

Mr. Miller, in the meeting last night, a question arose as to the declarant[']s duties to complete the roads and add the new sewage treatment center. Am I correct in saying that those projects will still remain the duty of the developer/declarant. I am looking at the change that was made in regards to the duties of declarant, as was discussed yesterday, and am wondering if that change would apply to the aforementioned construction projects. Please let me know.

In another email a few hours later, Mr. Hamlin further advised Mr. Miller:

Mr. Miller, in conferencing with the HOA, we are of the opinion that there needs to be some language that states that utilities and [roads] are the responsibility (financial, construction and completion) of the developer and not that of the individual homeowner or the HOA. Again, please understand that we recognize that these items will not be performed immediately but upon the completion and build out of each phase. Please advise.

Mr. Miller responded to Mr. Hamlin's email later that day and set out his understanding of the HOA's concerns and Mr. Moore's position on those points:

---

[2] The record does not contain the attachments to the minutes.

[3] Because the attachments to the minutes are not included in the record, we cannot discern the nature of the proposed changes to the bylaws.

It appears to me the HOA has added new conditions to the negotiations. Here is what I understand you are proposing:

1. That Mr. Moore assume the binding legal obligation to finish all roads in the five phases as well as to make any utility upgrades necessary to complete construction.
2. That you are asking Mr. Moore to obligate himself to (1) finish the roads and utility upgrades and (2) to pay for them himself.
3. That you are asking Mr. Moore to indemnify both the HOA and the property owners against any financial contribution toward either roads or utilities.
4. That you are seeking to have the roads top coated as the construction on each phase is completed.

Let me respond to each of my four numbered points above one at a time:

1. Mr. Moore certainly and sincerely intends to top coat the roads upon the completion of construction of all five phases. He cannot contractually obligate himself to be bound to do this however, as the prospects are too speculative at this point in the process. As we have discussed, this is likely a $500,000 obligation, and what happens if the housing market turns south and he only sells 2 homes in the next five years? The utility upgrades are, as well discussed, something he will have to do as needed to finish the project. They are not the essential issue in this negotiation. Our position is that Mr. Moore intends to do so upon completion of all phases, but cannot legally bind himself to do so.
2. As stated above, Mr. Moore intends to do this but cannot contractually obligate himself to do it.
3. Mr. Moore proposes a mutual indemnification arrangement. He will not ask the HOA to contribute to the cost of the construction or improvement that he does, and the HOA not ask him to bind himself to obligations of the prior developer.
4. Mr. Moore has consistently proposed that the top coat would not be installed until after the construction was complete in all five phases. I just wanted to clarify that the paving would have to wait until the entire five phases were completed.

I anticipate that this will be my final email on this issue. Unfortunately, if the HOA will not make reasonable accommodations to assist Mr. Moore, you all will end up doing exactly what you fear doing a special assessment on your lot to finish the paving. . . . Additionally, I would

remind you that the Bank is likely exempt from assessment under the current Covenants, which means the burden of the cost will fall on only a few owners. At least with a developer in place, if the remaining phases were finished, a special assessment would be divided over a much bigger community.

The closing did not occur on October 17, 2014. Mr. Moore presented the Bank with a proposed second amendment to the Agreement, which was never executed. Meanwhile, the parties continued to negotiate over the terms in dispute. On October 16, 2014, Mr. Hamlin emailed Mr. Miller again and made it clear that the HOA wanted Mr. Moore to recognize that he was responsible for completing the roads. Mr. Hamlin stated that, "A provision of the amendment should state that the HOA and the individual homeowners are not liable for any of the cost of development." Mr. Hamlin advised Mr. Miller that, "What we cannot assent to is the ratification of an amendment that shifts all liability to the homeowner for items that are developer responsibilities." He further stated that, "I am in the unfortunate position to have to say that if the only interest of Mr. Moore is to purchase property at a reduced price, build spec homes and turn a profit without assuming the role of the developer, then I see no reason to afford him the opportunity to be given declarant status."

In an October 30, 2014 letter to Ms. Young, Mr. Miller advised her that, despite the Bank's failure to sign the second amendment, it was his position that the Agreement, as modified by the first and second amendments, was still binding until November 30, 2014, and that Mr. Moore intended to close on the purchase on November 12, 2014, if the special stipulations contained in the Agreement had been satisfied. He requested Ms. Young's permission to attend her upcoming meeting with Mr. Hamlin "to discuss what the HOA will and will not agree to with respect to Covenant Amendments."

After the meeting with Mr. Hamlin and Ms. Young, Mr. Miller provided his client, Mr. Moore, with a summary of the meeting in an email on November 3, 2014. According to the email, the HOA was prepared to approve the proposed amendments as long as the following sentence was omitted: "As successor to the original Declarant, Charles Z. Moore has no duty or obligation to complete work left unfinished or incomplete by the prior Declarant." Mr. Miller informed Mr. Moore that "neither the developer (Spears) nor the bank has ever dedicated the roads to either the city (who will not accept the dedication in their current condition) or to the HOA." As a result, he stated, "the road issue still resides with the declarant." In conclusion, Mr. Miller advised Mr. Moore that, "If you are not willing to commit to the roads, I would recommend you not purchase this property."

On November 11, 2014, Mr. Miller emailed Mr. Hamlin with the "final versions of both documents" and stated that he had "reworded both documents to be consistent with the date of the owners meeting as well as Richard Chappell as the authorized signer." Mr. Miller also said that he had "not changed any actual terms other than what we agreed to at

our meeting today, but please review them carefully and advise as soon as you know that Mr. Chappell is prepared to sign them." The preamble of the proposed amendments to the CCRs included the following statement:

> WHEREAS, a sufficient number of the members of [the HOA] did, at a special called meeting held on October 15, 2014, authorize the President of the Association to approve this amendment to the Declaration.

The proposed amendments included the following change:

> Article 1, Section 7[4] is hereby deleted and replaced with the following provision:

> Section 7. "Declarants" shall mean and refer to Charles Z. Moore and any assigns or successors in interest that are identified by the recording of a Supplemental Declaration. *As successor to the Original Declarant, Charles Z. Moore has no duty or obligation to complete work left unfinished or incomplete by the Original Declarant.*

> Charles Z. Moore, and any assigns or successors in interest shall contribute one-half (50%) of the cost of the topcoat paving upon completion of construction of all five (5) phases of the Development Area. Said contribution shall not exceed the sum of two-hundred thousand dollars ($200,000.00) and such contribution shall represent the limit of liability of Charles Z. Moore or any assigns or successors in interest.

> Charles Z. Moore shall not require the Association to levy a special assessment to cover the costs of the currently existing deficiencies of the Original Declarant or for the costs of the expansion of the sewer services. . . .

> The provisions of Article I, Section 7, as amended herein, shall not be modifiable by Charles Z. Moore, his assigns or successors in interest without the majority approval of all lot owners other than Charles Z. Moore, his assigns or successors in interest. All other provisions of the Declaration not modified herein shall remain in full force and effect.

(Emphasis added). The next day, Mr. Hamlin forwarded the proposed amendments to Mr. Chappell. In his email, Mr. Hamlin stated: "It appears that the new documents are identical to the previous proposed amendments with the exception of the language agreed upon at

---

[4] In the original CCRs, Article I, section 7 provides only: "'Declarants' shall mean and refer to Hidden Lake Resorts, LLC."

last night's meeting."  He advised Mr. Chappell, if he was comfortable with the amendments, to execute the documents and Mr. Miller would retrieve them.  Less than an hour later, Mr. Miller emailed Mr. Hamlin to advise that Mr. Chappell had signed the documents.  Five minutes later, Mr. Miller emailed Mr. Hamlin again requesting a copy of the "October 15 board meeting whereat [sic] the owners authorized the board to execute the amendment on their behalf."  Mr. Hamlin replied:  "Just so you know, every board member was consulted about the proposed amendments as presented last night.  Assent was given to those amendment[s] by all board members this morning."

Later that day, November 12, 2014, the CCR amendments were recorded with the register of deeds.  The document was signed by Mr. Chappell as president of the HOA.

On November 13, 2014, the parties executed a Reinstatement and Second Amendment to the Agreement, drafted by the Bank's attorney, and the closing occurred the following day.  The purchase price was reduced to $712,500.  That document states: "Buyer waives all contingencies under the Agreement and accepts the Property AS-IS." On November 14, 2014, the sale closed.  The Bank and Mr. Moore executed an Assignment of Declarant Rights ("Assignment #2") which included a provision stating:  "It is expressly understood and agreed by and between the Assignor and Assignee that this document represents only the assignment of the Declarant's rights and is not an assumption of any of the past, present or future obligations of the Assignor."  The Bank provided Mr. Moore with a special warranty deed for HLR.

The next HOA board meeting was held on November 18, 2014.  The minutes of that meeting include the following statement:

> A deal was finally struck that Mr. Moore repair the roads and will pay 50% of the top coat not to exceed $200,000.00 in the current platted phases. . . . Current bids for the topcoat would be about $400,000.00.  It will be 5-6 years before the first phases are built out and the top coat can be applied. . . . Mr. Moore is responsible for all the common areas.  Mr. Moore has the [Architectural Review Committee] control but has to abide by the CCR's.
> . . .
> Jim Hudson stated he was not comfortable with not having input in the developer negotiations.  [Mr. Chappell] replied that at the previous meeting when the HOA's attorneys were present that the board agreed to let [Mr. Chappell and Mr. Belisle] [act as] primary board members for the deal.

By the January 15, 2015 board meeting, it was evident that the parties were not in agreement.  Mr. Moore and Mr. Miller were present at the meeting.  The Bank had turned off the street lights in HLR.  Mr. Chappell stated that the street lights should be paid by Mr. Moore and that "Mr. Miller said during the negotiations that Mr. Moore would be responsible for the common areas until conveyed near the end of the development."  Mr.

- 11 -

Miller advised that "Mr. Moore was taking over the development and not stepping in for Hal Spears."

In June 2015, the HOA filed suit against Mr. Moore seeking a declaratory judgment to determine the rights and obligations of the parties. Along with his answer, Mr. Moore filed a countercomplaint against the HOA and a third-party complaint against the Bank and the Town. The court denied a number of preliminary motions filed in the parties' attempts to have various claims dismissed. In July 2019, the HOA filed an amended complaint adding new defendants (four individuals and a trust to whom Mr. Moore had allegedly quitclaimed thirteen (13) HLR lots). In July 2021, the HOA filed a second amended complaint, which includes causes of action for a declaratory judgment, injunctive relief, and the imposition of resulting and constructive trusts.

In October 2021, the Bank filed a motion for summary judgment regarding all of Mr. Moore's claims against the Bank. Mr. Moore filed a motion to exclude the testimony of John Baird, Esquire, as an expert witness. In December 2021, the trial court granted the Bank's motion for summary judgment and dismissed Mr. Moore's third-party complaint against the Bank. The trial court determined that Mr. Moore's claims for rescission of the purchase contract and contribution failed because the Bank had negated essential elements of the claims and Mr. Moore failed to cite facts or law sufficient to support his claims.

All remaining claims went to trial over eight days in January and February 2022. During the trial, the court denied Mr. Moore's motions to exclude expert testimony from Mr. Wamble and Mr. Baird. (The order reflecting the trial court's denial does not appear in the appellate record.) The court entered a memorandum opinion on July 29, 2022, and then entered a final judgment incorporating the memorandum opinion on August 16, 2022. The court determined, in part, that "the obligations of the developer regarding the infrastructure were attendant to and ran with the rights transferred upon purchase." The court held that the amendments to the bylaws and CCRs asserted by Mr. Moore were never effectuated and rejected his claim of equitable estoppel. Further, the court ruled that the Town was legally obligated to require a bond to guarantee completion of the HLR roads. Mr. Moore appealed.

## The Issues on Appeal

The parties in this appeal have presented this Court with a number of issues. We have consolidated those issues as follows:

1. Whether the trial court erred in granting the Bank's motion for summary judgment.
2. Whether the trial court erred in granting the HOA's motion to compel the production of attorney-client documents.
3. Whether the trial court abused its discretion by allowing John Baird, Esq., and James D. Wamble to give expert testimony.

4. Whether the purported amendments to the charter and CCRs for HLR are void and/or unenforceable.
5. Whether the obligations of the original developer were binding on Mr. Moore.
6. Whether the trial court erred in concluding that the Town is not equitably estopped from denying issuance of building permits until a bond or other surety is in place.

ANALYSIS

I.     Summary judgment for the Bank

We will begin with the trial court's first dispositive order, entered in December 2021, granting the Bank's motion for summary judgment.

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). This means that "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. A disputed fact is material if it is determinative of the claim or defense at issue in the motion. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must submit evidence either "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting Tenn. R. Civ. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." Tenn. R. Civ. P. 56.06. If the moving party fails to show that he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin*,

- 13 -

271 S.W.3d at 83 (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

As stated above, Mr. Moore brought in the Bank as a third-party defendant and sought the following relief:

> 1. In the event that this Honorable Court finds that Moore does not have declarant rights, or is financially responsible for the improvement and maintenance of the private roads, that this Honorable Court would order the rescission of the purchase contract, repayment of all sums paid by Moore to Bank, including transaction costs and litigation expenses, and to restore legal title to the land to Bank.
> 2. Alternatively, that this Honorable Court would award Moore a judgment against Bank for contribution toward any costs Moore is required to pay for improvement and maintenance of the private roads and or any incomplete infrastructure items that the original developer left undone.

Mr. Moore also requested an order that the Bank owed HOA dues for the period during which it owned the property.

The Bank moved for summary judgment on these claims in October 2021 with supporting depositions and exhibits. The Bank argued that Mr. Moore's rescission claim was barred by the doctrine of merger and by the as-is clause in the Reinstatement. Further, the Bank asserted that the rescission claim failed because Mr. Moore failed to come forward with any evidence to establish failure of consideration or mutual mistake. The Bank took the position that Mr. Moore's other two claims, for contribution and payment of HOA dues, failed as a matter of law. In response to the Bank's substantive arguments on rescission, Mr. Moore addressed the merger doctrine and the effect of the "as-is" wording in the Reinstatement. With respect to the Bank's arguments on the lack of proof to justify rescission for lack of consideration or mutual mistake, Mr. Moore made no substantive response beyond the following sentence: "Even if the Court finds that the merger doctrine applies and Moore accepted the property "as is," the Court should still declare that Bancorp breached its contract, which should be rescinded for lack of consideration." He cited no evidence to support his claim for rescission due to lack of consideration or mutual mistake.

The trial court heard the summary judgment motion on December 10, 2021. In an order entered on December 27, 2021, the trial court examined the three claims made by Mr. Moore against the Bank. As to the claim regarding HOA fees, the court determined that Mr. Moore lacked standing; only the HOA had standing to assert a claim for HOA fees owed to it. Mr. Moore sought rescission of the purchase contract on theories of failure of consideration or mutual mistake based upon his argument that he bought HLR with the understanding that he would not be liable for the development of the roads and other

- 14 -

obligations and that the agreement he signed in 2014, the Reinstatement and Second Amendment to the Agreement, contained terms to which he did not agree. The trial court concluded that, pursuant to the merger doctrine, "the agreements signed before the deed merged into the deed and the language of the deed controls." Moreover, the trial court found that Mr. Moore had failed to provide evidence of a failure of consideration, stating:

> BancorpSouth established that Moore received the reinstatement, and the special warranty deed containing the terms, and regardless of whether he and his attorney read the documents before signing off, Moore acquired valuable property in exchange for payment of money. Moore has failed to demonstrate evidence of a failure of consideration to rebut the presumption of consideration created by the reinstatement and deed.

Further, the trial court ruled that Mr. Moore "failed to produce evidence of mutual mistake regarding the execution of the documents sufficient to justify rescission." The court noted that Mr. Moore "may have been unilaterally mistaken about the terms of the agreement," and again emphasized that Mr. Moore and his attorney "apparently failed to read the reinstatement agreement and deed and that negligence on their part caused the mistake."

Finally, the trial court ruled that Mr. Moore's third claim, for contribution in the event he was found liable to the cost of the roads and infrastructure improvements, failed: "Only if Moore satisfies his obligation to the HOA would he have any basis for contribution." Because Mr. Moore had failed to "show sufficient facts to establish the essential elements of his case upon which he will bear the burden of proof at trial," the trial court granted the Bank's motion for summary judgment.

In this appeal, Mr. Moore's arguments address only the trial court's grant of summary judgment on his claim for rescission. Thus, we agree with the Bank's position that Mr. Moore has waived any challenge to the grant of summary judgment on the other two claims. *See PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship v. Mabry*, 402 S.W.3d 654, 661 (Tenn. Ct. App. 2012) (quoting *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002)) ("'[W]hen a party raises an issue in its brief, but fails to address it in the argument section of the brief, we consider the issue to be waived.'").[5]

As to the trial court's ruling on Mr. Moore's rescission claim, we agree with the trial court that the Bank was entitled to summary judgment because Mr. Moore failed to come forward with any evidence of mutual mistake or lack of consideration to show that he was entitled to rescission. The Bank did not have the burden of proving Mr. Moore's rescission

---

[5] Mr. Moore makes one statement in the argument section regarding the contribution claim, asserting that, "[i]f this Court affirms the trial court's holding that Moore is responsible to complete the original developer's obligations, then the Bank should be held responsible to indemnity Moore for any related expenses." He cites no legal support. We consider the issue waived as it is not our role to research or argue an appellant's case for him. *See Sneed v. Bd. of Pro. Resp.*, 301 S.W.3d 603, 615 (Tenn. 2010).

claim at trial. The Bank submitted evidence "demonstrating that the nonmoving party's [Mr. Moore's] evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Thus, Mr. Moore could not "'rest upon the mere allegations or denials of [his] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, he was required to respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06. Mr. Moore made no such response before the trial court (or this Court). Therefore, the trial court properly granted the Bank's motion for summary judgment. We need not address the Bank's other theories to support the trial court's decision on this issue.

## II.     Discovery issue

Mr. Moore asserts that the trial court erred in granting HLR's motion to compel the production of documents from the file of his former counsel; he argues that the documents were protected by attorney-client privilege.

We have determined that Mr. Moore has waived this issue because the relevant portions of his appellate brief do not comply with Tenn. R. App. P. 27. Tennessee Rule of Appellate Procedure 27 governs the content of appellate briefs. Subsection (a) of that rule identifies the requirements for the appellant's brief and provides, in pertinent part, as follows:

> The brief of the appellant shall contain under appropriate headings and in the order here indicated:
> (1) A table of contents, with references to the pages in the brief;
> (2) A table of authorities, including cases (alphabetically arranged), statutes and other authorities cited, with references to the pages in the brief where they are cited;
> . . .
> (4) A statement of the issues presented for review;
> (5) A statement of the case, indicating briefly the nature of the case, the course of proceedings, and its disposition in the court below;
> (6) A statement of facts, setting forth the facts relevant to the issues presented for review with appropriate references to the record;
> (7) An argument, which may be preceded by a summary of argument, setting forth:
>    (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, *with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on*; and

(B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues);

(8) A short conclusion, stating the precise relief sought.

(Emphasis added).

Our Supreme Court and this Court have emphasized "the importance of properly raising an issue on appeal and the consequence of a failure to comply with the requirements of Rule 27." *City of Memphis v. Edwards by and through Edwards*, --- S.W.3d ---, 2023 WL 4414598, at *2 (Tenn. July 5, 2023). We have "'repeatedly held that a party's failure to cite authority for its arguments or to argue the issues in the body of its brief constitute a waiver on appeal.'" *Waddell v. Waddell*, No. W2020-00220-COA-R3-CV, 2023 WL 2485667, at *16 (Tenn. Ct. App. Mar. 14, 2023) (quoting *Forbess v. Forbess*, 370 S.W.3d 347, 355 (Tenn. Ct. App. 2011)).

In this case, Mr. Moore's brief does not include, in the statement of the case or the argument on this issue, a reference to the location in the record where the challenged order appears. *See* TENN. R. APP. P. 27(a)(7)(A). The pertinent motion to compel is not included in the record on appeal. Moreover, Mr. Moore's brief argument contains no standard of review, no citations to legal authority, and no citations to the record. *Id.* Based upon Mr. Moore's failure to comply with the requirements of Tenn. R. App. P. 27(a)(7) in his appellate brief, we conclude that he has waived this issue.

III.    Expert testimony

Mr. Moore argues that the trial court erred in allowing John M. Baird to testify on questions of law and in allowing James D. Wamble to give expert testimony regarding factual issues "outside the issues framed by the pleadings."

Under Tenn. R. App. P. 24, it is the duty of the appellant "to prepare the record which conveys a fair, accurate, and complete account of what transpired in the trial court regarding the issues which form the basis of the appeal." *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005); *see also* TENN. R. APP. P. 24(b), (c). The record on appeal does not include the order in which the trial court denied Mr. Moore's pretrial motions to exclude the testimony of Mr. Baird and Mr. Wamble. Mr. Moore's brief cites the page ranges for the entire testimony of each expert witness and does not reference any rulings by the trial court on evidentiary objections during the trial. Therefore, Mr. Moore has again failed to comply with Tenn. R. App. P. 27(a)(7)(A). Under these circumstances, we must conclude that Mr. Moore has waived the evidentiary issues he raised in this appeal. *See Waddell*, 2023 WL 2485667, at *16; *McCollough v. Rawls*, No. E2018-00016-COA-R3-CV, 2019 WL 516699, at *2 (Tenn. Ct. App. Feb. 11, 2019) (quoting *Wells v. Ill. Cent. R. Co.*, No. W2010-01223-COA-R3-CV, 2011 WL 6777921, at *6 (Tenn. Ct. App. Dec.

- 17 -

22, 2011)) (stating that an appellant's failure to "'ensure that documents necessary to consider a particular issue raised on appeal are included in the appellate record constitutes an effective waiver of the appellant's right to appeal that issue'").

IV.     Amendments to CCRs

In reviewing the remaining issues, we will apply the general standards of review applicable to non-jury cases. Thus, we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Turner v. Turner*, 473 S.W.3d 257, 269 (Tenn. 2015). We review a trial court's conclusions on issues of law de novo without a presumption of correctness. *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 382 (Tenn. 2015). The proper interpretation of a contract presents a question of law, which we review de novo with no presumption of correctness. *Four Eights, LLC v. Salem*, 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005).

Mr. Moore takes the position that he was led to believe that the HOA board had authority to act on behalf of the HOA and that the HOA is estopped from contesting amendments to the CCRs.[6] The HOA argues that the proposed amendments to the CCRs are void and unenforceable. We agree with the HOA.

On November 12, 2014, two days before his purchase of HLR was closed, Mr. Moore recorded a document purporting to amend the CCRs for HLR. (Pursuant to HLR's bylaws, the CCRs are incorporated into the bylaws.) The document was signed by Mr. Chappell as president of the HOA. By their terms, the amendments replaced a number of provisions of the CCRs with new provisions. In this appeal, Mr. Moore relies particularly upon the following language included in the amendments to Article I, section 7:

> "Declarants" shall mean and refer to Charles Z. Moore and any assigns or successors in interest that are identified by the recording of a Supplemental Declaration. As successor to the Original Declarant, Charles Z. Moore has no duty or obligation to complete work left unfinished or incomplete by the Original Declarant.

The new provisions also stated that Mr. Moore "shall contribute one-half (50%) of the cost of the topcoat paving upon completion of construction of all five (5) phases of the Development Area" and that this contribution "shall represent the limit of liability" of Mr. Moore or his successors in interest. Mr. Moore argues that this document was a

_____

[6] Mr. Moore also mentions amendments to HLR's "bylaws" and "charter." In addition to the CCRs, the appellate record includes articles of incorporation and bylaws for HLR. However, we find nothing in the record, and no citation to anywhere in the record, concerning amendments to these documents that were actually adopted. The parties focus their arguments on the amendments to the CCRs, and we will limit our analysis to their arguments.

prerequisite to his purchase of the HLR and that the HOA is estopped from contesting these amendments.

It is important first to establish that these amendments to the CCRs were not enacted in accordance with the CCRs and bylaws. Article XI, section 3 of the CCRs provides that the CCRs "shall be amended as provided in the ByLaws."[7] Article XIII provides, in pertinent part, as follows:

> Section 2. The covenants, conditions and restrictions of the Declaration shall run with the land, for a term of twenty (20) years from the date of recording, after which time they shall be automatically extended for successive periods of ten (10) years. The said Declaration may be amended during the first twenty (20) year period by an instrument signed by not less than seventy-five (75%) percent of the Members and thereafter by an instrument signed by not less than sixty-seven (67%) of the Members. Any amendment to the said Declaration must be recorded and shall be subject to Section 3 below.

> Section 3. <u>Mortgagee Approvals</u>. Any and all amendments eligible for approval in Section 1 and Section 2 of this Article shall be subject to the following conditions and restrictions:

> . . .

> (b) Amendments of a material nature must be agreed to by Members who represent at least sixty-seven (67%) percent of the total allocated votes in the Association. In addition thereto, approval must be obtained from Eligible Mortgage Holders who represent at least fifty-one (51%) percent of the votes of Lots that are subject to mortgages held by eligible [mortgage] holders . . . . A change to any of the following shall be considered under this Section as material:
> (1) Voting Rights.
> (2) Assessments, assessment liens, or the priority of assessment liens.
> (3) Reserves for maintenance, repair and replacement of Common Areas.
> (4) Responsibility for maintenance and repairs. . . .

---

[7] This article also gives the declarant a unilateral right to amend the CCRs during the first six years from the recording of each plat. That provision does not, of course, apply here because more than six years have passed.

The amendments at issue here were approved by all five members of the *board of directors* of the HOA, not by the required 67% of the votes of the entire HOA. Further, the amendments were not presented to or approved by eligible mortgage holders.

Is the HOA estopped from contesting the amendments to the CCRs despite the fact that they were not approved in accordance with the CCRs' requirements? As our Supreme Court has stated, "The doctrine of equitable estoppel arises from the equitable maxim that no person may take advantage of his or her own wrong." *Redwing v. Cath. Bishop for Diocese of Memphis*, 363 S.W.3d 436, 460 (Tenn. 2012). The burden of proof lies with the party seeking to invoke the doctrine of equitable estoppel. *Id.*

To successfully invoke the doctrine of equitable estoppel, the party seeking to invoke the doctrine must establish the following elements with respect to the other party:

> "(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts."

*Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004) (quoting *Consumer Credit Un. v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990)). In addition, the invoking party must establish the following elements with respect to itself:

> "(1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially."

*Id.* (quoting *Consumer Credit*, 801 S.W.2d at 825). The principle is well established that where both parties have the same means of ascertaining the true facts there can be no estoppel:

> "It is essential, as a general rule, to the application of the principle of equitable estoppel, that the party claiming to have been influenced by the conduct or declarations of another to his injury, was himself not only destitute of knowledge of the state of the facts, but was also destitute of any convenient and available means of acquiring such knowledge, and that *where the facts are known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel.*"

*Haymon v. City of Chattanooga*, 513 S.W.2d 185, 188-89 (Tenn. Ct. App. 1973) (quoting *Crabtree v. Bank*, 67 S.W. 797, 799-800 (Tenn. 1902)) (internal citations omitted) (emphasis added).

In rejecting Mr. Moore's assertion of the defense of equitable estoppel, the trial court found:

> The proof at trial established that Moore and his attorney were aware of the requirements necessary to amend the CCR's and bylaws and therefore could not reasonably rely upon the representation in the CCR's amendments, which they drafted, that the amendment had been approved by a sufficient number of members at a meeting on October 15, 2014. The proof at trial was no such meeting took place on October 15, 2014, and Moore and Miller did not produce an instrument signed by the requisite number of members.

On appeal, Mr. Moore argues, "It was reasonable for Moore and Miller [Mr. Moore's attorney] to believe that Hamlin and Chappell had the authority to negotiate and execute the amendments to the CCRs." The clear language of the CCRs and bylaws required a vote of the membership, not of the board of directors, to amend the CCRs. The HOA board is not authorized to act on behalf of the members to amend the CCRs.[8] Mr. Moore asserts that he "had no way of knowing whether the meeting [on October 15, 2014] occurred, who attended the meeting, what was discussed, or, what vote or votes were taken at the meeting." Yet, Mr. Moore's attorney repeatedly requested, and never received, assurances from the HOA that a vote of the HOA members had occurred. Mr. Moore, a sophisticated businessman, decided to close on his purchase of the HLR development two days after recording the purported amendments to the CCRs; he knew or should have known that the amendments were not validly adopted. Mr. Moore's arguments to the contrary are unconvincing.

The trial court reached the following conclusion regarding Mr. Moore's estoppel claim:

> [T]he Court finds Moore and his attorney had the knowledge of what was required for a valid amendment, and further had knowledge that a signature of the President alone, without the signatures of 75% of members, was ineffective to execute a valid amendment. The claim of estoppel is without merit.

---

[8] Section 1(c) of Article VII of the bylaws provides that the Board shall have the power to "[e]xercise for the Association all powers, duties and authority vested in or delegated to this Association and *not reserved to the membership by other provision of these Bylaws, the Articles of Incorporation, or the Declaration*." As discussed, the CCRs and bylaws reserve the right to amend the CCRs to the membership.

We agree with the trial court.

## V. Mr. Moore's duties as successor declarant

We now address the most difficult issue presented by this case. Mr. Moore argues that "the obligations of the original developer were not binding" on him. The HOA asserts that Mr. Moore received all of the declarant rights and obligations when he purchased HLR.

### 1. Fundamental legal principles

This case involves a residential development subject to restrictive covenants set forth in the CCRs. Covenants, conditions, and restrictions contained in such declarations establish property interests that run with the land. *See Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 475 (Tenn. 2012). These property interests "arise from a series of overlapping contractual transactions." *Id.* The CCRs, therefore, "should be viewed as contracts and examined as such." *Id.*

The purchase and sale agreements are contracts. *Id.* at 465. In interpreting a contract, we seek to ascertain the intent of the parties from the language of the contract; in so doing, we must apply to those words their usual, natural, and ordinary meaning. *Staubach Retail Servs.-SE, LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn. 2005). We derive the intent of the parties from the four corners of the contract, the circumstances surrounding the making of the contract, and the parties' actions in effectuating the contract. *Hughes*, 387 S.W.3d at 465.

When interpreting a deed, we are "primarily concerned with ascertaining the intention of the grantor." *Id.* at 466. To ascertain the grantor's intent, courts look to the words of the deed as well as the surrounding circumstances. *Id.* The interpretation of a deed, like the interpretation of a contract, presents a question of law. *Id.*

### 2. Transfer from LLC to the Bank

A preliminary question is the status of the Bank in these transactions. The Bank provided Mr. Spears with financing in 2005 when he began developing the property; shortly thereafter, Mr. Spears transferred his interest to the LLC, which assumed the loan, and the Bank recorded a new deed of trust. After the LLC defaulted on the loan, the successor trustee held a sale in September 2011, and the Bank purchased HLR, its collateral for the defaulted loan. The successor trustee's deed transferred all of the successor trustee's "right, title and interest in and to the described real estate" to the Bank.

As part of the foreclosure, the LLC executed Assignment #1, which states, in pertinent part, that "the Assignee [the Bank] foreclosed on its Loan on the Development and also acquired all of Assignor's [the LLC's] rights as Declarant under the Declaration [CCRs] pursuant to that certain Successor Trustee's Deed," which was recorded with the

- 22 -

register of deeds. The assignment also includes the following provision: "It is expressly understood and agreed by and between the Assignor and Assignee that this document represents only the assignment of the Declarant's rights and is not an assumption of any of the past, present or future obligations of the Assignor." Thereafter, the Bank made no effort to develop the HLR property. The Bank facilitated the formation of the HOA and, at the first HOA meeting, told the homeowners that the Bank would not complete the work of the original developer. The Bank hired a real estate agent to market and sell the property.

Relying upon the language of Assignment #1, Mr. Moore argues that the trial court erred in ruling that the Bank possessed all of the rights and obligations of the declarant/developer. He warns that this ruling "has the potential to dramatically affect the relationship between lenders and developers." Mr. Moore asserts that the imposition of such liability on a lender or subsequent purchaser of foreclosed collateral may lead to the disappearance of development loans at reasonable rates and discourage subsequent purchasers because of their reluctance to assume the original declarant's obligations. Mr. Moore fails to account for the fact that, as stated above, restrictive covenants such as those established in the CCRs run with the land. When a restrictive covenant runs with the land, "it passes automatically with the land when ownership or possession changes, whether or not the successor consents." *Phillips v. Hatfield*, 624 S.W.3d 464, 473 (Tenn. 2021).

A restrictive covenant that runs with the land is considered a servitude. *Id.* A servitude "is a . . . legal device[ ] that private parties use to create rights and obligations that run with land, which are useful precisely 'because they create land-use arrangements that remain intact despite changes in ownership of the land.'" *Id.* (quoting RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.1(1), 1.1 cmt. a. (AM. L. INST. 2000)). Servitudes "'permit the creation of neighborhoods restricted to particular uses.'" *Id.* (quoting RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.1 cmt. a.).

As the trial court stated, the issue here is whether the Bank, as "purchaser of all right, title and interest held by the original declarant, can extinguish the duties and obligations that ran with the ownership of the development." Mr. Moore cites authorities from other states for the proposition that "a developer's obligations do not pass downstream to a money lender." *See Rothis v. M & I Marshall & Isley Bank*, No. 8:10-cv-446-T-23EAJ, 2010 WL 3893960 (M.D. Fla. Sept. 29, 2010); *1000 Grandview Ass'n, Inc. v. Mt. Washington Assocs.*, 434 A.2d 796 (Pa. Super. Ct. 1981); *First Wisc. Nat'l Bank of Milwaukee v. Roose*, 348 So.2d 610 (Fla. Dist. Ct. App. 1977); *Christiansen v. Philcent Corp.*, 313 A.2d 249 (Pa. Super. Ct. 1973). All of these cases, however, are distinguishable from the present case in that the bank was the mortgagee on the loan for the development and not, as in the present case, the purchaser of the development at a foreclosure sale. And, where the lending bank acts as an active participant in the development and exercises significant control, courts have found a basis for liability. *See Connor v. Great Western Sav. & Loan Ass'n*, 69 Cal. 2d 850 (Cal. 1968).

In our case, the Bank purchased the collateral property at foreclosure and became the owner of the property. Some states insulate lenders who purchase collateral to satisfy a debt from taking on the role of developer. *See McKnight v. Bd. of Dirs.*, 512 N.E.2d 316 (Ohio 1987).[9] In Tennessee, there is no statute or caselaw allowing a bank that purchases development property at foreclosure from assuming declarant status. As a practical matter, the Bank avoided taking on most declarant obligations by facilitating the purchase of the property within a reasonably short period of time. For present purposes, however, the key point is that the Bank obtained declarant status when it purchased the property at the foreclosure sale, a conclusion confirmed by Assignment #1 executed by the Bank and the LLC.

What the Bank and the LLC attempted to do in Assignment #1 was to separate the rights of the declarant from the attendant duties. The document states, in pertinent part:

---

[9] The court in *McKnight* explained:

> Generally, a secured party who takes collateral and sells or retains it in order to satisfy debt for which the collateral is given is a purchaser for value. However, the General Assembly has carved out an exception to that rule as it applies to financial institutions involved in condominium developments. This is apparent from the lack of limiting language in R.C. 5311.01(N). Although the General Assembly could easily have limited the application of R.C. 5311.01(N) to the warranty provisions provided in the chapter, it did not.
>
> Appellants contend that a mortgagee acquiring title to property through foreclosure or by accepting a deed in lieu of foreclosure does not necessarily assume the role of developer. As mortgagee holding the real estate as security for the loan, the bank has a right to foreclose and take title to the security upon the mortgagor's default. The mortgagee then has the right to sell the property to satisfy the debt.
>
> We agree with First Federal's contention that by acquiring title to property either through foreclosure or by accepting a deed in lieu of foreclosure, a mortgagee does not necessarily assume the role of the "developer" as defined by R.C. 5311.01(T). Generally, banks and other financial institutions that lend money to finance condominium developments are in the business of lending money and not building or developing condominiums. When such a lender is forced into its position as owner after a legitimate loan goes into default, the lender must be given the right to salvage its interest by selling the property. Such a situation, in and of itself, does not compel the lender to assume the obligations of a developer imposed by R.C. Chapter 5311 or the articles and bylaws of the condominium association.
>
> It follows that a mortgagee acquiring title to property or other collateral has the right to protect its interest by taking reasonable steps to maintain or preserve the property. However, when the mortgagee performs such acts as to become so intertwined with the promotion and development of the property that it, in essence, has engaged in the business of the developer, it cannot insulate itself from the duties, constraints and obligations of a developer pursuant to R.C. Chapter 5311.

*McKnight*, 512 N.E.2d at 318-19 (footnote omitted).

1. Effective November 14, 2014, [the LLC] hereby assigns and sets over to [the Bank] *all of the rights of Declarant under the Declaration*; and
2. It is expressly understood and agreed by and between [the LLC] and [the Bank] that this document represents only the assignment of the Declarant's rights and is not an assumption of any of the past, present or future obligations of [the LLC].

(Emphasis added). One might interpret this language as insulating the Bank from any of the LLC's indebtedness. Mr. Moore is arguing that these provisions transferred to the Bank only the rights, but not the responsibilities, of the declarant (and, therefore, the Bank could only transfer the declarant rights to Mr. Moore). To allow the LLC to assign only the rights of the declarant, but none of the responsibilities, to the Bank would effectively nullify the existence of the servitudes created by the CCRs.

An assignment has been defined as "'a transfer of property or some other right from one person (the "assignor") to another (the "assignee").'" *Action Chiropractic Clinic, LLC v. Hyler*, 467 S.W.3d 409, 411 (Tenn. 2015) (quoting 6 AM.JUR.2D *Assignments* § 1 (2008)). As a general principle of law, "the assignee 'steps into the shoes of the assignor' with regard to the matters covered by the assignment." *SunTrust Bank, Nashville v. Johnson*, 46 S.W.3d 216, 226 (Tenn. Ct. App. 2000) (quoting *Aetna Cas. & Sur. Co. v. Tennessee Farmers Mut. Ins. Co.*, 867 S.W.2d 321, 323 (Tenn. Ct. App. 1993); *Binswanger Southern (N.C.), Inc. v. Textron, Inc.*, 860 S.W.2d 862, 865 (Tenn. Ct. App. 1993); *Brummitt Tire Co. v. Sinclair Refining Co.*, 75 S.W.2d 1022, 1028 (Tenn. 1934)). In order to determine whether a particular assignment is valid, courts apply principles of general contract law. *Action Chiropractic*, 467 S.W.3d at 411. Under contract law, "'A contractual right can be assigned unless . . . (b) the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy.'" *Petry v. Cosmopolitan Spa Int'l, Inc.*, 641 S.W.2d 202, 203 (Tenn. Ct. App. 1982) (quoting RESTATEMENT (THIRD) OF CONTRACTS § 3.7(2) (1981)).

We believe that these general legal principles as well as public policy considerations prohibit parties from assigning declarant rights without the attendant obligations. We agree with the following reasoning stated by the trial court:

This Court finds that where the Bank assumed the ownership of the property, which is subject to the CCR's and by-laws of the HOA and further subject [to] the conditions and requirements for annexation imposed by the Town of Ashland City, it cannot unilaterally avoid the attendant obligations by adding language to the assignment asserting that it was not assuming any such obligations. The fact that the Bank did not fulfill any of the obligations of the original declarant/developer does not mean that those obligations were extinguished.

- 25 -

In this case, the original plats of the five (5) phases were approved by the Town's planning commission. The Town annexed at least a portion of the property with the condition that the developer bear the cost of construction of the infrastructure. Obviously, these homeowners who had purchased lots and constructed homes did so with the understanding that the developer would fulfill his obligation and complete the infrastructure. . . . Where, as here, the developer entered into an agreement to assume the responsibility for completing the infrastructure, the HOA which represents individual homeowners, is a third-party beneficiary to the contractual obligations assumed by the developer and have a justiciable claim regarding their rights.

### 3. Transfer from Bank to Moore

Mr. Moore asserts that all of the contracts related to his purchase of HLR "evidence a settled intent and agreement that Moore was not assuming the responsibility to complete the roads and necessary improvements," with the exception of contributing up to $200,000 to the top coating of the roads. We will consider each of these arguments in turn.

Mr. Moore points to the Agreement executed by the Bank and Mr. Moore on August 8, 2014, which "requires Moore to accept a deed subject to the recorded CCRs which vested equitable title in the HOA." This is the totality of Mr. Moore's explanation of his argument; he does not identify specific language from the Agreement or further articulate his position. We decline to create an argument for Mr. Moore on this point.

Mr. Moore further relies upon the special stipulation addendum to the Agreement, which states, in part: "Buyer acknowledges that the roads and amenities serving the completed phases (1-5) are the property of the Hidden Lake Resort Homeowners Association, and Seller has no authority to grant permissions regarding any property of the Association." In his two-sentence argument on this point, Mr. Moore also states that the Bank's lawyer added this language. The gist of Mr. Moore's argument here seems to be that the roads and amenities are the property of the HOA. The apparent purpose of this language is to clarify that the Bank cannot grant permissions to Mr. Moore regarding what the Bank understands to be the HOA's property. At the time of Mr. Moore's purchase of HLR, the phases were not complete, and there had been no transfer of ownership of roads or amenities to the HOA.

More importantly, even if we accepted the proposition that the HOA owned the roads and amenities, the issue of Mr. Moore's responsibility to complete this infrastructure remains. As the trial court noted, the language of the special stipulation "makes no mention of the duty regarding the completion of the roads or other infrastructure." The trial court found that there was "a distinction between ownership of the roads and the duty to construct to completion." Furthermore, as the trial court emphasized, "the original agreement

expired and lapsed because [Mr. Moore] refused to close, and the Reinstatement and Second Amendment to the Lot/Land Purchase and Sale Agreement clearly and unambiguously provided that the Buyer (Moore) waived all contingencies under the agreement and accepted the property "'AS-IS.'" We find nothing in the purchase and sale agreements to negate the declarant's responsibilities as provided in the CCRs.

As we have already concluded, Mr. Moore's attempt to amend the CCRs was unsuccessful. Therefore, his reliance upon the purported amendments to support his position must fail.

Next, Mr. Moore focuses upon a provision in the special warranty deed dated November 14, 2014, by which he gained ownership of HLR. The second paragraph of the deed states:

> To have and to hold said real estate, with the appurtenances, estate, title, and interest belonging to the said Grantee [Mr. Moore], its successors and assigns forever. Grantor [the Bank] covenants that it is lawfully seized and possessed of the said real estate in fee simple, has a good right to convey, and that the same is unencumbered, except as shown on Exhibit B.

Exhibit B, entitled "Permitted Exceptions," includes nine exceptions, three of which Mr. Moore considers relevant here: (1) Paragraph 2: "Matters shown on the Plan of record" recorded in the register's office; (2) Paragraph 3: "Declaration of Covenants, Conditions, Liens, Easements and Restrictions, including, but not limited to, easements, special assessment, changes and liens" contained in the recorded CCRs; and (3) Paragraph 9: "Title to that portion of the premises embraced within the bounds of any streets, roads, or highways." Again, Mr. Moore does not expound upon his argument after citing these portions of the special warranty deed. The import of the quoted language is that the Bank could not warrant that it had fee simple title with no encumbrances to the excepted items. The first two exceptions reference the recorded plats and CCRs. The third (paragraph 9) carves out the roads and streets, which would become the property of the HOA upon completion. We agree with the trial court that the exception "does not alter the obligation of the developer/declarant to construct them [the roads, streets, and highways]."[10]

---

[10] The trial court noted that, under the CCRs and bylaws, the roads and common areas are to be owned by the HOA "at the time of the conveyance of the first lot." The trial court went on to discuss the vagueness of this provision:

> [T]his provision is vague as to what that ownership entails. If the first lot was conveyed when the roads were gravel or incomplete, would the HOA, which had not yet even come into actual existence, take ownership and be responsible for constructing all roads through the development? If ownership actually passed to the HOA upon the sale of the first lot, would that mean that the first lot owner, as the sole homeowner, would bear the burden and cost of owning and constructing the roads?

- 27 -

Finally, Mr. Moore relies upon Assignment #2 executed by him and the Bank on November 14, 2014. This assignment includes the following language:

> It is expressly understood and agreed by and between the Assignor [the Bank] and Assignee [Mr. Moore] that this document represents only the assignment of Declarant's rights and is not an assumption of any of the past, present or future obligations of the Assignor.

Based upon the same general principles and public policy considerations discussed above with respect to the assignment between Mr. Spears and the Bank, we conclude that this provision is void. To hold otherwise, would allow a bank and purchaser to nullify the recorded restrictive covenants that run with the land.

## VI. Equitable estoppel against the Town

Mr. Moore argues that the trial court erred in denying him the relief he sought with respect to the Town of Ashland City—namely, a declaratory judgment that the Town was equitably estopped from denying him building permits until a bond or other surety was in place.

A few additional facts are required to understand the dispute between Mr. Moore and the Town. As previously stated, Mr. Spears sought the annexation of most of the property constituting HLR, and the Town ultimately did annex the two tracts of property at issue through ordinances enacted in 2004 and 2011. Prior to enacting the annexation ordinances, the Town's city council passed Resolution 2004-10 and Resolution 2011-04, which adopted plans of service for the property being annexed. Resolution 2004-10 provided that the developer was responsible for building all roads to Town standards at the developer's expense and that roads and streets in the annexed area "shall be owned and maintained, to include reconstruction and resurfacing, by the owners' association." Resolution 2011-04 stated that "all road and street construction as well as maintenance in Hidden Lakes which is a PUD remain with the developer and homeowners association." Further, the developer was required to provide sanitary sewer service and/or install the lines necessary to tie into the Town's system or Pleasant View Utility District's system.

Each of the plats recorded by Mr. Spears in 2005, 2006, and 2008 for the five phases of HLR contained a certification "that all designated public ways" on the plat had been installed to the Town's specifications or a bond or other surety had been posted with the planning commission.[11] There were similar certificates regarding approval of the water and public sewer systems. Mr. Spears was not required by the Town to post a bond.

---

[11] The signature line for the Certificate of Approval of Public Ways or Bond posting was titled "Appropriate Governmental Representative." The certificate was signed by Harold Spears.

Before purchasing HLR in November 2014, Mr. Moore approached the Town about taking over the roads in the development. The Town did not agree to accept responsibility for the roads in HLR.

Mr. Moore's grievance with the Town arises from the Town's refusal to supply him with building permits for new construction unless he provides a bond insuring the completion of the roads, as required by Tenn. Code Ann. § 13-4-308(a)(1)(B). Tennessee Code Annotated section 13-4-308, amended in 2014, states, in pertinent part:

> (a)(1) From and after the time when the platting jurisdiction of any municipal planning commission has attached as provided in § 13-4-302, no building permit shall be issued and no building shall be erected on any lot within the municipality, unless one (1) of the following circumstances is met:
> (A) The street giving access to the lot upon which the building is proposed to be placed has been accepted or opened as, or shall have otherwise received the legal status of, a public street prior to that time;
> (B)(i) The street corresponds in its location and lines with a street shown on a subdivision plat approved by the planning commission and recorded in the register of deeds;
> (ii) Whenever the street or other infrastructure improvements as denoted on the plat have not been completed, *there shall be an adequate, valid, and enforceable bond, or an adequate, valid, and enforceable other guarantee for the completion of the improvements, which shall be held by the appropriate officials as provided in § 13-4-303*. This subdivision (a)(1)(B)(ii) shall not be construed to require duplicate bonds or to require additional bonds when an adequate bond to complete the infrastructure is already in effect. This subdivision (a)(1)(B)(ii) shall not be construed as requiring a building contractor to post the bond required by § 13-3-403 on the infrastructure for the subdivision if such building contractor is not a developer of the subdivision;
> (C) The lot fronts upon a permanent easement which conforms to all rules, regulations and specifications applicable to the permanent easement of the planning commission or other departments, divisions or agencies of the municipality and so long as the permanent easement has access to an existing highway, street, or thoroughfare, or with a street located or accepted by the chief legislative body of the municipality after submission to the planning commission and, in case of the commission's disapproval, by the favorable vote required in § 13-4-307; or
> (D) The street corresponds in its location and lines with a street shown on a street plat made and adopted by the commission.

(Emphasis added). Under Tenn. Code Ann. § 13-4-308(a)(1)(B), a bond or other guarantee is required if "[t]he street corresponds in its location and lines with a street shown on a

subdivision plat approved by the planning commission and recorded in the register of deeds." None of the other circumstances addressed by Tenn. Code Ann. § 13-4-308 applied to HLR, whose streets were private, not public.[12]

In his estoppel argument, Mr. Moore relies upon the version of Tenn. Code Ann. § 13-4-308 in effect at the time when the Town approved the plats for HLR (2005 through 2008). According to his interpretation of the statute, it required a bond from HLR, yet the Town did not require Mr. Spears to provide a bond. The version of the statute in effect in 2005 provided, in pertinent part, as follows:

> (a)(1) From and after the time when the platting jurisdiction of any municipal planning commission has attached as provided in § 13-4-302, no building permit shall be issued and no building shall be erected on any lot within the municipality, unless the street giving access to the lot upon which the building is proposed to be placed has been accepted or opened as, or shall have otherwise received the legal status of, a public street prior to that time, *or unless such street corresponds in its location and lines with a street shown on a subdivision plat approved by the planning commission*, or on a street plat made and adopted by the commission, or unless such lot fronts upon a permanent easement which conforms to all rules, regulations and specifications applicable to the permanent easement of the planning commission or other departments, divisions or agencies of the municipality and so long as the permanent easement has access to an existing highway, street, or thoroughfare, or with a street located or accepted by the chief legislative body of the municipality after submission to the planning commission and, in case of the commission's disapproval, by the favorable vote required in § 13-4-307.

(Emphasis added). As the Town points out, the bond requirement for streets included in a subdivision plat was added in 2014. Prior to that time, the Town could issue building permits for streets shown on a subdivision plat without a bond. Mr. Moore's interpretation of the statutory requirements prior to 2014 is erroneous. Therefore, we reject his premise that the Town erroneously approved the plats without a bond.[13]

---

[12] At the end of the estoppel section of his brief, Mr. Moore includes the assertion that a provision requiring payment of a bond to the Town for the completion of private roads is not for public benefit and "arguably" is a violation of Article II, Section 29 of the Tennessee Constitution. This argument was not raised by Mr. Moore at the trial level and, therefore, was not addressed by the trial court. Moreover, Mr. Moore's appellate brief does no more than raise the issue and does not include an argument. For both reasons, we consider the issue waived.

[13] Mr. Moore also cites a provision of the Town's subdivision regulations stating: "When a bond is required, the secretary of the Planning Commission shall endorse approval of the plat after the bond has been approved by the Planning Commissioner and after all the conditions of the resolution pertaining to the

The remainder of Mr. Moore's argument here is that the planning commission's approval of the plats induced him to act to his detriment and that he was "induced to purchase from the Bank on the reasonable assumption that he would be able to obtain building permits for the lots he purchased." Mr. Moore cites *Greenwood v. City of Lebanon*, No. M2016-01168-COA-R3-CV, 2017 WL 1404385, at *6 (Tenn. Ct. App. Apr. 19, 2017), and emphasizes the following language:

> Yet, "a municipality will not be permitted to rely intentionally upon unauthorized acts or to take advantage of such acts to avoid its obligations or to work a fraud . . . upon an innocent party who has been induced by the corporation to rely upon an act and who has reasonably relied upon that act."

These principles do not apply here, however, because the Town did not engage in an unauthorized act by approving the HLR plats without requiring a bond. Moreover, Mr. Moore can point to no action taken by the Town to induce him to make the purchase of HLR. He asserts that "the Town is equitably estopped from denying its previous representations concerning streets and bonds," presumably referring to the Town's decision not to require a bond from Mr. Spears. There was no misrepresentation to Mr. Moore; the law changed such that a bond is now required for the Town to issue a building permit to Mr. Moore.

The trial court did not err in rejecting Mr. Moore's equitable estoppel argument.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Charles Z. Moore, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

plat have been satisfied." Contrary to Mr. Moore's argument, this provision itself does not require a bond; rather, it applies "[w]hen a bond is required." None was required for HLR prior to 2014.